[No. B128557. Second Dist., Div. Two. Jan. 13, 2000.]

ARYA GROUP, INC., Plaintiff and Appellant, v.
CHER et al., Defendants and Respondents.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of footnote 2 and parts II. through VI. of the Discussion.

**COUNSEL**

Castle & Lax, Nomi L. Castle and Julie Fleming for Plaintiff and Appellant.

Mandel & Norwood, S. Jerome Mandel and Lilly Lewis for Defendants and Respondents.

## OPINION

**MALLANO, J.\***—Arya Group, Inc. (Arya) appeals from the orders dismissing its action against the respondents herein, Cher, the Inshallah Trust, Janet L. Bussell, Tutt Design Group, Inc. (Tutt) and Hawthorne Savings, F.S.B., after demurrers to Arya's second amended complaint were sustained without leave to amend. (Code Civ. Proc., § 581, subd. (f)(1).) Arya contends the trial court's rulings constituted an abuse of discretion because the factual allegations in Arya's second amended complaint show Arya "is entitled to relief under legal theories of breach of contract, promissory estoppel, quantum meruit and unjust enrichment, account stated, fraud, intentional interference with economic relationship, conversion, and violation of Civil Code [section] 1719."

### THE COMPLAINT

The material allegations of Arya's second amended complaint, which we assume to be true for purposes of reviewing a ruling sustaining a demurrer without leave to amend (*Mirkin v. Wasserman* (1993) 5 Cal.4th 1082, 1087 [23 Cal.Rptr.2d 101, 858 P.2d 568]), may be summarized as follows. Cher is the beneficiary and trustor of the Inshallah Trust, which is the record owner of real property located in Malibu. In June 1996, representatives of Cher and the Inshallah Trust (hereafter referred to collectively as Cher) negotiated an oral agreement with Arya, whereby Arya was to design and construct a house on the Malibu property. Cher consented to pay Arya the sum of $4,217,529 for Arya's provision of design, construction, general contracting and supervision services. She further agreed that Arya would "be paid progress payments upon periodic percentages of project completion." The parties' oral agreement was subsequently memorialized in a written contract bearing an August 1997 date, which was delivered to Cher in early October 1997. Cher never signed the contract, despite her promise to do so.

Between June 1996 and November 1997, Cher assured Arya that the contract would be honored and that Arya would receive full compensation for the construction services it provided under the contract. In fact, Arya did receive payment from Cher for a number of services it discharged under the contract, e.g., reviewing and revising construction plans, performing site stabilization, preparing a set of plans and specifications sufficient to obtain and maintain new permits for the property, setting up facilities and site supervision on the property, commencing construction on the project and "making substantial progress in several areas, including concrete, structural

---

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

steel, framing, grading, and the pool," and hiring licensed architects to perform design services.

Commencing in August 1997 and continuing through November 1997, Cher requested that Arya meet with Bussell, a designer who owned and managed Tutt, a Florida corporation, and who had previously worked with Cher on "speculative residential projects" in Florida. In the course of meeting with Bussell, Arya showed Bussell the plans and designs for the Malibu property and introduced her to various of Arya's subcontractors and suppliers. Unbeknownst to Arya, the meetings with Bussell were part of a plan by Cher (who had never intended to sign the contract with Arya or honor its terms) to induce Arya to divulge proprietary information relating to the Malibu property so Cher could terminate her contract with Arya without paying Arya for all of the services it had provided, and replace Arya as the general contractor and designer.

In November 1997, Cher terminated her agreement with Arya, without paying the $415,169.41 balance then due Arya, and "stopped payment on an order for the payment of money to Arya for services [it had] provided . . . under the Contract." In addition, Cher, Bussell, and Tutt contacted several of Arya's subcontractors in an effort to induce them to breach their contracts with Arya and work directly with Cher, misappropriated for their own use the plans, designs and drawings Arya had prepared, and had the permits obtained by and issued to Arya transferred to Cher's name. They also spread "false and damaging rumors about Arya," which included statements that "Arya and its principals were thieves, wrongfully abandoned a job, breached contracts, could not pay its bills, engaged in dishonest billing practices, and performed substandard work."

DISCUSSION

I. *First Cause of Action: Breach of Contract*

■ We are initially called upon to decide a very narrow question of first impression, whether, as a matter of law, Arya is precluded under Business and Professions Code section 7164 from pursuing a breach of contract claim as a result of its failure to secure a signed written contract for the construction of Cher's residence.[1] Section 7164 reads: "(a) Notwithstanding Section 7044 [owner-builder exemption], every contract and any changes in a contract, between an owner and a contractor, for the construction of a single-family dwelling to be retained by the owner for at least one year shall be

---

[1] Unless otherwise indicated, all further statutory references are to the Business and Professions Code.

evidenced in writing signed by both parties. [¶] (b) The writing shall contain the following: [¶] (1) The name, address, and license number of the contractor. [¶] (2) The approximate dates when the work will begin and be substantially completed. [¶] (3) A legal description of the location where the. work will be done. [¶] (4) The language of the notice required pursuant to Section 7018.5. [¶] The writing may also contain other matters agreed to by the parties to the contract. The writing shall be legible and shall clearly describe any other document which is to be incorporated into the contract. Prior to commencement of any work, the owner shall be furnished a copy of the written agreement, signed by the contractor. The provisions of this section are not exclusive and do not relieve the contractor from compliance with all other applicable provisions of law. [¶] (c) Every contract subject to the provisions of this section shall contain, in close proximity to the signatures of the owner and contractor, a notice in at least 10-point bold type or in all capital letters, stating that the owner has the right to require the contractor to have a performance and payment bond and that the expense of the bond may be borne by the owner."[2]*

It is evident from the various legislative documents dealing with section 7164 furnished by the Legislative Intent Service that the statute was intended to afford consumers who contract for the construction of a single-family dwelling (which will be retained by the owner for at least one year) safeguards already available under section 7159 to consumers who contract for "home improvement" work.[3] For example, single-family ·dwelling contracts, like home improvement contracts, must be in writing and signed by both parties and must contain certain specified information, including a notice stating that the owner has the right to require the contractor to ,have a performance and payment bond, the expense of which may be borne by the owner.

The similarities between sections 7159 and 7164 are helpful because the effect of noncompliance with section 7159 is an issue which was considered by the California Supreme Court in *Asdourian v. Araj* (1985) 38 Cal.3d 276 [211 Cal.Rptr. 703, 696 P.2d 95] (*Asdourian*). (See also *Davenport & Co. v. Spieker* (1988) 197 Cal.App.3d 566 [242 Cal.Rptr. 911].) In *Asdourian*, a

*See footnote, *ante*, page 610.
[3] At Arya's request, we have taken judicial notice of the materials provided by the Legislative Intent Service. (Evid. Code, §§ 452, subd. (c), 459; *Commodore Home Systems, Inc. v. Superior Court* (1982) 32 Cal.3d 211, 218, fn. 9 [185 Cal.Rptr. 270, 649 P.2d 912].) While the language of section 7164 is not ambiguous per se, it is certainly inconclusive regarding the intended consequences of a violation of the statute. Inasmuch as the " 'general object of the legislation . . . , and the mischiefs sought to be remedied' " (*Parr v. Municipal Court* (1971) 3 Cal.3d 861, 866 [92 Cal.Rptr. 153, 479 P.2d 353]) may shed some light on this question, we deem it appropriate to consider the legislative history with this prospect in mind.

contractor sought compensation from two property owners for remodeling work performed pursuant to oral contracts. The owners contended that since any agreements between the parties were oral, they violated section 7159 and were thus void.

Although the Supreme Court acknowledged that, generally speaking, "a contract made in violation of a regulatory statute is void," it stressed that " 'the rule is not an inflexible one to be applied in its fullest rigor under any and all circumstances' " and " '[a] wide range of exceptions has been recognized.' " (*Asdourian, supra,* 38 Cal.3d at p. 291.) By way of example, the court pointed out that "the rule will not be applied where the penalties imposed by the Legislature exclude by implication the additional penalty of holding the contract void. [Citations.]" (*Ibid.*) In addition, the court noted that "[i]n compelling cases, illegal contracts will be enforced in order to 'avoid unjust enrichment to a defendant and a disproportionately harsh penalty upon the plaintiff.' [Citation.]" (*Id.* at p. 292.) The court explained, " ' "In each case, the extent of enforceability and the kind of remedy granted depend upon a variety of factors, including the policy of the transgressed law, the kind of illegality and the particular facts." ' " (*Ibid.*)

The court stated that the policy underlying section 7159 "is to encourage written contracts for home improvements in order to protect unsophisticated consumers." (*Asdourian, supra,* 38 Cal.3d at p. 292.) In reviewing the evolution of section 7159, the court determined the Legislature intended neither that the express misdemeanor penalty provision of the statute would be exclusive nor that all contracts made in violation of the statute would be void, thereby opening the door to enforcement of nonconforming contracts in appropriate cases. (*Asdourian, supra,* 38 Cal.3d at p. 292.) The court concluded *Asdourian* was just such a case, citing the fact that (1) the defendants were not members of the group primarily in need of the statute's protection, i.e., unsophisticated consumers, (2) contracts made in violation of section 7159 are not " 'intrinsically illegal,' " and (3) if the defendants were allowed to retain the value of the benefits bestowed by the plaintiff without compensating him, they would be unjustly enriched. (38 Cal.3d at pp. 292-293.)

The issue of whether the instant matter is truly a "compelling case" within the meaning of *Asdourian* cannot be definitively resolved at the demurrer stage. However, application of the principles and considerations identified in *Asdourian* to the facts established by Arya's second amended complaint persuades us that this case is one in which Arya *might* be entitled to some relief. It appears from the operative pleading that Cher is a highly sophisticated homeowner with previous involvement in residential construction

projects, that her legal representatives assisted her in negotiating the Malibu construction project agreement with Arya, that Arya had already completed a substantial amount of the work it contracted to perform when Cher terminated the parties' agreement, and that Cher would be unjustly enriched if she were not required to compensate Arya for the reasonable value of its work. Under these circumstances, we decline to hold that Arya's noncompliance with section 7164 absolutely forecloses it from seeking to enforce the oral agreement it purportedly made with Cher, which was allegedly memorialized in an unsigned written contract. On the other hand, should it become apparent in the course of a motion for summary judgment or trial that "the facts are otherwise than as alleged and are such as to place the case outside the exceptions to the general rules regarding enforceability of illegal contracts," our holding here would not preclude Cher from reasserting her position about the illegality and unenforceability of any agreement between her and Arya in the absence of a signed written contract. (*Calwood Structures, Inc. v. Herskovic* (1980) 105 Cal.App.3d 519, 523, fn. 2 [164 Cal.Rptr. 463], disapproved on another point in *Asdourian, supra,* 38 Cal.3d at p. 293, fn. 11.)

In deciding that "upon the facts recited [Arya] has stated a cause of action which on its face should not have been dismissed" (*Calwood Structures, Inc. v. Herskovic, supra,* 105 Cal.App.3d at p. 523, fn. 2), we recognize that the absence of a criminal penalty distinguishes section 7164 from section 7159, and also acknowledge the *Asdourian* court's observation that the misdemeanor penalties sufficed to serve the underlying legislative policy of that statute. (*Asdourian, supra,* 38 Cal.3d at p. 292.) Nonetheless, this distinction does not persuade us the Legislature intended that any and all construction contracts which fall within the scope of section 7164 must be deemed void and wholly unenforceable if they are not "evidenced in writing signed by both parties," as required by the statute. The Legislature has shown it is perfectly capable of drafting a statute which limits a party's ability to sue, where that is its intent. Within the Contractors' State License Law itself, the Legislature has generally precluded an unlicensed contractor from "bring[ing] or maintain[ing] any action, or recover[ing] in law or equity in any action, in any court of this state for the collection of compensation for the performance of any act or contract for which a license is required . . . , regardless of the merits of the cause of action brought by the person . . . ." (§ 7031, subd. (a).) In light of the clear statutory policy of deterring unlicensed contract work, the California Supreme Court has steadfastly held that unlicensed contractors are not only barred from pursuing breach of contract actions, but may not urge equitable theories of recovery, such as unjust enrichment or fraud based on a false promise to pay for unlicensed construction work. (*Hydrotech Systems, Ltd. v. Oasis Waterpark* (1991) 52 Cal.3d

988, 997-1002 [277 Cal.Rptr. 517, 803 P.2d 370] (*Hydrotech*); *Lewis & Queen v. N. M. Ball Sons* (1957) 48 Cal.2d 141, 150-152 [308 P.2d 713].) In contrast, in the context of contracts made in violation of section 7159, the court held, "Absent an express statutory *prohibition*, other exceptions to the general rule that illegal contacts are unenforceable. may be applied." (*Asdourian, supra*, 38 Cal.3d at p. 292, original italics.)

We cannot accept respondent's suggestion that "*Asdourian* has been seriously eroded, if not altogether superseded" by the California Supreme Court's more recent decisions in *Phillippe v. Shapell Industries* (1987) 43 Cal.3d 1247 [241 Cal.Rptr. 22, 743 P.2d 1279] (*Phillippe*) and *Hydrotech, supra*, 52 Cal.3d 988. At issue in *Phillippe* was the provision of California's statute of frauds dealing with brokerage commissions (currently subd. (a)(4) of Civ. Code, § 1624), which declares that oral agreements "authorizing or employing an agent, broker, or any other person to purchase or sell real estate . . . for compensation or a commission" are invalid. Our high court has repeatedly withheld traditional equitable remedies from licensed real estate brokers whose commission agreements fail to adhere to the statute of frauds and, in *Phillippe*, the court rejected the notion that a licensed real estate broker can assert equitable estoppel against a statute of frauds defense to an oral commission agreement in the absence of a showing of actual fraud. (43 Cal.3d at pp. 1260-1264.) In so doing, the court reaffirmed the soundness of the *Asdourian* decision in the context of home improvement contracts, observing in pertinent part, "There are significant differences between home improvements and brokerage commissions. Home improvements are tangible and can be relatively easily verified and appraised to determine their reasonable value. Such was the case in *Asdourian*, in which the contractor recovered the reasonable value of his services. A broker's services do not result in a tangible product so it is more likely that there will be disputes as to what the broker has done and what such services may be worth. As in *Asdourian*, a home improvement dispute will typically involve only a single contractor seeking to recover. Due to the nature of the real estate business, however, several competing brokers may claim a commission for a single transaction. Written contracts help minimize such confusion." (*Phillippe, supra*, 43 Cal.3d at p. 1266, fn. 12.)

In *Hydrotech*, the California Supreme Court simply reaffirmed what is obvious from reading section 7031, that "[r]egardless of the equities, section 7031 bars all actions, however they are characterized, which effectively seek 'compensation' for illegal unlicensed contract work." (*Hydrotech, supra*, 52 Cal.3d at p. 997.) However, section 7031 has no application to the facts of this case, and as we have previously indicated, the unequivocal language of section 7031 differs markedly from that of section 7164.

Consequently, we hold that Arya may seek to enforce its contract claim against Cher to the extent Cher would otherwise be unjustly enriched as a result of her failure to compensate Arya for the reasonable value of its work on the Malibu construction project.[4] In light of our holding, we of necessity conclude that the trial court erred in sustaining Cher's demurrer to Arya's first cause of action without leave to amend.

II.-VI.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The orders sustaining respondents' demurrers are reversed as to the first, third, eighth and ninth causes of action, and affirmed as to all other causes of action. The award of costs to respondents in the amount of $883 is also reversed. The parties shall bear their own costs on appeal.

Boren, P. J., and Cooper, J., concurred.

---

[4]This court's interpretation of section 7164 will not render the mandate of the statute a nullity since contracts made in violation of the statute will not be enforced where a compelling case is not made. Moreover, even where enforcement is warranted, a contractor will be permitted to recover for the reasonable value of the work performed only to the extent that the owner would be unjustly enriched at the expense of the contractor if enforcement were denied. If, for whatever reason, failure to compensate the contractor will not result in the unjust enrichment of the owner, there will be no recovery, regardless of what the contractor might have been entitled to collect under a contract which conformed with the requirements of section 7164.

*See footnote, *ante*, page 610.