Filed 4/24/14  Simeone v. MCR Construction CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| NICK SIMEONE et al.,<br><br>        Plaintiffs, Cross-defendants and Appellants,<br><br>        v.<br><br>MCR CONSTRUCTION, INC., et al.,<br><br>        Defendants, Cross-complainants and Appellants. | B236480<br><br>(Los Angeles County<br>Super. Ct. No. EC049557) |

APPEAL from a judgment of the Superior Court of Los Angeles County, William D. Stewart, Judge.  Affirmed.

Troy A. Stewart for Plaintiffs, Cross-defendants and Appellants.

Burlison Law Group and Robert C. Burlison, Jr., for Defendants, Cross-complainants and Appellants.

———————————————

INTRODUCTION

At issue in this appeal is two projects to develop real property that went awry. Plaintiffs Nick and Lisa Simeone and GFI Investments, Inc., a California corporation (plaintiffs or GFI), sued defendants Mark and Lori Rolph and their construction company, MCR Construction, Inc. (defendants or MCR). Plaintiffs' complaint sought, inter alia, to void the construction contract governing one of the projects on the ground the agreement was oral in violation of provisions of Business and Professions Code section 7150 et seq. (the Home Improvement Business statutes).[1] GFI also requested a declaration that it owned clear title to a second piece of property. MCR cross-complained alleging it held title to the second property. Following a bench trial, the trial court entered judgment in favor of defendants on plaintiffs' declaratory relief claim and against plaintiffs on their remaining causes of action, but ordered defendants to reimburse plaintiffs $23,059.16 in overcharged workers' compensation insurance. Plaintiffs appeal and defendants cross-appeal. We discern no trial court error and affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

We state the evidence according to the usual rules of appellate review. (*Estate of Teel* (1944) 25 Cal.2d 520, 526-527.) Nick[2] Simeone is a baker who also manages apartment buildings and develops real estate for investment purposes. Nick formed GFI to invest in and develop real property. Lisa Simeone, Nick's wife, is a licensed real estate agent. Mark Rolph is president of MCR, and has been a licensed general contractor for 20 years. Lori Rolph, Mark's wife, is treasurer of MCR. Plaintiffs and

---

[1]     All further statutory references are to the Business and Professions Code, unless otherwise noted.

[2]     For clarity, we may refer to individuals by their first names and mean no disrespect thereby.

defendants worked together on a series of projects in which defendants provided construction services to plaintiffs. Only two of those projects are at issue in this appeal.[3]

1. *The Joaquin Drive project*

a. *The oral agreement and the dispute*

Plaintiffs liked the work defendants had previously performed for them on various properties, including one house plaintiffs owned at 28<u>38</u> Joaquin Drive, Burbank. In 2005, plaintiffs entered into an oral "cost plus" contract with MCR to develop a single-family dwelling at 2828 Joaquin Drive in Burbank (the Joaquin Drive project). During construction in the Spring of 2007 when the Joaquin Drive project was about 75 percent complete, defendant walked off the job because plaintiffs were not paying MCR's bills.

Feeling that MCR's invoices were fabricated and that defendants overcharged them and breached the oral construction agreement, plaintiffs filed their complaint seeking damages and equitable relief from defendants for defective construction of, and unauthorized improvements to, the Joaquin Drive project. As is relevant to this appeal, plaintiffs sought rescission of the oral construction agreement, and restitution under the Unfair Competition Law (§ 17200 et seq. (the UCL)) based on a violation of the Home Improvement Business statutes, in particular, section 7159 which requires among other things, that certain home improvement contracts be in writing.

b. *The Evidence Code section 402 hearing*

On its own motion and in advance of trial, the trial court held an evidentiary hearing (Evid. Code, § 402) into whether the Joaquin Drive project was a "home improvement" as defined by section 7151,[4] reasoning that plaintiffs' theory of their case

---

[3]    The lawsuit also involved property at 3011 Scott Road and 839 East Harvard Road in Burbank, and St. Estaban Way in Tujunga. The property at 28<u>38</u> Joaquin Drive, Burbank, was not part of the underlying lawsuit.

[4]    In pertinent part, section 7151 reads, " 'Home improvement' means the repairing, remodeling, altering, converting, or modernizing of, or adding to, residential property and shall include, but not be limited to, the construction, erection, replacement, or improvement of driveways, swimming pools, including spas and hot tubs, terraces, patios, awnings, storm windows, landscaping, fences, porches, garages, fallout shelters,

3

largely involved violation of the Home Improvement Business statutes (§ 7151 et seq.). The court wanted to determine whether the construction fell within the definition of those statutes so that evidence concerning these statutes could be admissible at trial.

After a four-day hearing, the trial court ruled that the Joaquin Drive project was not a "home improvement." Section 7151 defines a home improvement as "repairing, remodeling, altering, converting, or modernizing of, or adding to" residential property whereas the court found the project was new construction. The court rejected plaintiffs' evidence that the project was a renovation of the existing house. The court relied heavily on the testimony of Burbank building inspector Tom O'Malley, who opined based on his "frequent observations," that the entire house was razed except for a minimal piece of foundation. The court determined "this was new construction, except for that piece of foundation." The court found, "[s]o far as the City was concerned, it was a change in the building," and quoted from O'Malley, that " 'the fact is, it's [*sic*] a new home.' " Ruling "This project as originally contemplated and as carried out was not a 'home improvement' project . . . ," the court prohibited the parties from using the words "home improvement" in front of the jury.

Plaintiffs amended their complaint to substitute the violation of section 7164 as the predicate for their UCL cause of action. That provision of the Home Improvement Business statutes requires a written contract for *construction* of a single-family dwelling to be retained by the owner for at least a year.[5] Plaintiffs alleged in this version of their complaint that the Joaquin Drive agreement was a "Home Improvement Contract" as

---

basements, and other improvements of the structures or land which is adjacent to a dwelling house. 'Home improvement' shall also mean the installation of home improvement goods or the furnishing of home improvement services." Section 7159 requires a home renovation contract to be written.

[5] Section 7164, subdivision (a) reads: "Notwithstanding Section 7044 [listing exceptions to the requirements of the Contractors' State License Law], every contract and any changes in a contract, between an owner and a contractor, for the construction of a single-family dwelling to be retained by the owner for at least one year shall be evidenced in writing signed by both parties."

defined by section 7151.2 but was oral in violation of section 7164, with the result that defendants' failure to reduce the contract to writing was an unfair or fraudulent business practice within the meaning of section 17200.

The parties tried the case to the bench. Whether plaintiffs retained the Joaquin Drive property for a period of one year, as required for section 7164 to apply, "consumed a moderately generous portion of the trial" primarily because the court did not think the statute provided a clear definition of the phrase " 'to be retained.' "

The court heard the testimony that plaintiffs and defendants had known each other since approximately 2000. Mark testified the two couples socialized "all the time." They ate dinner out and he and Nick ate lunch "at least twice a week together." Mark went to Nick's son's wedding; Nick attended Mark's 40th birthday party; and the two watched sporting events together. Nick asked Mark to help him develop the Joaquin Drive property for speculation. However, over the course of construction, Nick changed his mind about the goal of the project, fixtures, and tile.

Although Nick claims to be a baker by trade, he also has vast experience in real estate. In addition to the five properties plaintiffs hired defendants to develop (see fn. 3, *ante*), Nick and Lisa either together or individually owned a residence on Jolly Drive, property on Cedar Avenue, and "several" apartment buildings, including one on North Catalina Street that Nick managed. Nick denied owning the property at 1404 Buena Vista Street, claiming it belonged to his son. Yet, the exhibits showed that Nick purchased the property, quitclaimed it to Lisa, *who quitclaimed it back to Nick,* who transferred it to Nick's son. The Shell Street property was in Lisa's name. Finally, Nick told Mark that he had purchased a tri-plex and was remodeling it while living in one of the units. Nick formed Tujunga Partnership, LLC and GFI. Nick wanted to be partners in MCR because he believed he would run MCR better than Mark could.

At the close of trial, the court issued a 33-page statement of decision. With respect to the Joaquin Drive project, the court ruled in relevant part, that plaintiffs and MCR entered into an oral agreement for construction of a whole house. The court found the parties planned to remove all of the structure except for one wall and build a new

5

house incorporating that wall.  The remaining wall was ultimately dismantled.  Plaintiffs engaged in this practice to avoid paying higher taxes, but that fact did not make the project a "home improvement" or a remodel as defined under section 7159, the court ruled.  As for plaintiffs' allegations the project was new construction and governed by section 7164, the court cited *Asdourian v. Araj* (1985) 38 Cal.3d 276, superceded on other grounds by § 7031 (*Asdourian*) and *Arya Group, Inc. v. Cher* (2000) 77 Cal.App.4th 610 (*Arya Group*) and found that plaintiffs were "indeed sophisticated consumers," and that plaintiffs did not want a written agreement for the Joaquin Drive project; they wanted to be able to make changes and alterations to the project as it moved along.  Based on these facts, the court declined to apply "the draconian remedies" of the Home Improvement Business statutes to void the contract for the Joaquin Drive project.

2. *The St. Estaban Way property*

The other property at issue in this appeal concerns title to six lots on St. Estaban Way in Tujunga (the St. Estaban property).  This portion of the lawsuit was brought by GFI against MCR.  GFI, whose president was Nick, alleged that in November 2002 it entered into an oral joint venture agreement with MCR to develop the St. Estaban property into residences.  Mark testified the costs of improvements and profits were to be split 75 percent for GFI and 25 percent for MCR.  However, the complaint alleged, GFI conveyed title to the St. Estaban property to MCR, for the "sole[] purpose that MCR could obtain a construction loan for the residential development of St. Estaban."  Title was held by MCR as of December 2002.  Construction was never commenced, although some brush was cleared and preliminary designs were made.  GFI's complaint sought:  a judicial declaration that it owned both legal and beneficial title to the St. Estaban property; an injunction prohibiting MCR from encumbering, selling, or clouding title to the property; and the imposition of a constructive trust to preserve the property.

MCR cross-complained seeking damages for breach of contract with respect to the St. Estaban property.  MCR alleged that plaintiffs owed it money for the balance on the Joaquin Drive project and for other obligations, and did not pay certain costs and

6

expenses accrued on the St. Estaban property. As a result, MCR alleged, the parties agreed "that the St. Estaban property would be owned outright by MCR."

The issue at trial with respect to the St. Estaban property was "whether MCR was legally obligated to return to GFI its [GFI's] original 75 [percent] interest" in the St. Estaban property. Testimony at trial revealed that MCR and GFI entered into an oral joint venture agreement under which GFI would contribute 75 percent and MCR would contribute 25 percent of the investment in the St. Estaban property; together the parties would develop the property and split the profits 75-25. Mark testified he first learned that GFI had transferred 100 percent of the St. Estaban property to MCR *after that conveyance was complete*; the two never discussed this transfer before it was made. According to Mark, Nick wanted to "hide the profits through [Mark's] company. And [GFI] would save on the capital gains at the end when we sold the project." Mark refused to hide the money and repeatedly demanded that Nick take back 75 percent of the interest in the property. Nick declined. Mark wanted Nick to be sure to transfer title to St. Estaban property back to GFI before MCR took out any loans on the property because Mark did not want to bear the entire risk.

However, by April 2007, GFI was roughly $182,000 behind on its payments to MCR, including interest to the date of trial. MCR calculated this amount was comprised of money plaintiffs owed defendants on the Scott Road project, taxes and some invoices plaintiffs owed defendants on the St. Estaban property, money GFI borrowed from MCR, and unpaid bills on the Joaquin Drive project. Unable any longer to purchase materials for the St. Estaban project, Mark complained to Nick that MCR was not GFI's bank. Mark proposed to Nick that MCR keep the St. Estaban property in its name in exchange for what GFI owed MCR, "[a]nd then you guys [GFI] are out the [St.] Estaban deal." (Italics added.) Nick returned a few days later to report that the other GFI partners agreed to the proposal. As a result of this deal (hereinafter the 2007 debt forgiveness agreement), MCR erased the $182,000 debt in exchange for which MCR kept the St. Estaban property in its name. MCR never filed a mechanics lien on the Joaquin Drive property for the bills plaintiffs had not paid.

7

After trial, the court found that GFI indeed conveyed the property to MCR, but not solely for the purpose of obtaining a construction loan, as plaintiffs' complaint alleged. Rather, the court found GFI conveyed the property also for a "nefarious motive which was to hide the profits and hence to avoid taxes." Finding defendants' evidence to be more credible than that of plaintiffs, the court ruled that GFI had not presented sufficient evidence to rebut the presumption by clear and convincing evidence that owner of legal title is the owner of beneficial title. (Evid. Code, § 662.)[6] Consequently, the court declared that MCR held full beneficial title to the property, and that GFI had no right, title, or interest in the St. Estaban Way project, and that MCR retains full responsibility for the design and professional fees, taxes and assessments in evidence at trial.

The court also found that the future of the GFI-MCR joint venture agreement was "truly a question of credibility," and that Nick agreed on behalf of GFI to accept Mark's offer for MCR to keep the St. Estaban property in return for forgiving plaintiffs' debts to defendants. Based on this finding, the court ruled that the St. Estaban property "belongs entirely to MCR" and that the joint venture agreement between GFI and MCR "was terminated by the agreements of the parties for good and sufficient consideration." (Boldface and italics omitted.) The trial court entered judgment declaring MCR owns full legal and beneficial title to the St. Estaban property and declining to impose the requested constructive trust or issue the requested injunction.

3. *Workers' compensation insurance*

Plaintiff's complaint alleged that defendants falsely charged them for labor and workers' compensation insurance costs on the Joaquin Drive project. They alleged that the oral contract for that project provided that "MCR would charge and bill the Simeones for labor and material, *and* overhead of 10% and profit of 10% of the cost of labor and materials, *and* workers' compensation insurance of 30% of the cost of labor." (Capitalization omitted.) They also alleged that this same 30-percent arrangement was

---

[6] Evidence Code section 662 states, "The owner of the legal title to property is presumed to be the owner of the full beneficial title. This presumption may be rebutted only by clear and convincing proof."

used in two other, fully executed contracts between the parties. Plaintiffs alleged that the amounts actually charged for the Joaquin Drive workers' compensation insurance were fraudulent, a breach of contract, violation of the home improvement consumer protection statutes (§ 7150 et seq.), and an unfair business practice (§ 17200), for which they sought rescission and restitution.

The evidence showed that Nick hired people to work on the Joaquin Drive project who were not MCR employees, were not licensed, and were uninsured. When non-MCR workers were hurt during construction, MCR paid the medical bills. Nick also hired MCR employees to work on the project on weekends. Mark felt that it was unethical to hire MCR employees to work on weekends and told Nick to stop and to make sure anyone else he hired was licensed and had workers' compensation insurance.

After plaintiffs' case, defendants moved for judgment (Code Civ. Proc., § 631.8), on the grounds, inter alia, that plaintiffs agreed to, and did pay the Joaquin Drive contract and other contracts before it that contained the same terms for workers' compensation insurance, and there was no evidence that the amount was an overcharge, was illegal, or fraudulent. The court granted defendants' motion stating the workers' compensation insurance charge was a "fair and regular charge."

The trial court reconsidered its ruling during the ensuing presentation of defendants' case. It rejected its first reason for reconsideration, namely its concern that defendants might have had a motive to charge the workers' compensation insurance at the 30 percent rate to secretly recover the profit they were losing by agreeing to the 10-percent profit margin.

Ultimately the court ordered defendants to reimburse plaintiffs $23,059.16 in workers' compensation payments. The court explained that defendants incorrectly billed plaintiffs for $23,059.16 for workers' compensation insurance for " 'Independent Contractors with Time Card,' " i.e., casual employees, "hired to do some task, but not . . . placed on the regular payroll, and instead be paid cash after signing a time card." The court found that "the premiums charged by the insurance companies was based on the *payroll* records of the defendant corporation, *not* on these casual-labor payments.

9

Thus, MCR did not actually incur any *insurance* charges itself for these [casual] workers" (italics added) although, MCR did incur *expenses* for injured casual laborers. Determining that the parties' agreement was not "clear," the court then construed the oral Joaquin Drive contract to mean that the workers' compensation insurance charge of 30 percent of each labor dollar, as contemplated by the parties, meant charges made by the insurance carrier. Therefore, the court ruled, because MCR did not purchase insurance for the casual laborers, MCR "incorrectly billed" plaintiffs $23,059.16 for those workers. Nonetheless, the court found, this overcharge was a simple billing error and not fraud or a misrepresentation because MCR was saving these charges "as a nest egg against which to pay claims arising from these casual workers." The court ruled plaintiffs therefore could not recover on their causes of action for breach of contract, fraud, misrepresentation, "or otherwise," but ordered defendants to repay plaintiffs $23,059.16 for the overcharge error.

The court entered judgment reflecting these findings and ordered that each party bear its own costs. Plaintiffs timely appealed and defendants timely cross-appealed.

CONTENTIONS

Plaintiffs contend (1) the trial court erred in ruling the Joaquin Drive project was not a "home improvement" under section 7151, which ruling deprived plaintiffs of their UCL cause of action; (2) the trial court erred in finding plaintiffs had not rebutted the presumption of Evidence Code, section 662 and in declaring MCR held legal and beneficial title to the St. Estaban property; (3) the statute of frauds invalidated the 2007 debt forgiveness agreement concerning the St. Estaban property; and (4) the trial court erred in ruling plaintiffs must bear their own costs.

MCR contends (1) the trial court erred in awarding the Simeones $23,059.16 in workers' compensation insurance overpayment, and (2) defendants are entitled to costs because they were the prevailing party at trial.

10

DISCUSSION

1. *The trial court did not err in enforcing the Joaquin Drive contract.*

Plaintiffs contend that "[t]he trial court erred in precluding [their] UCL claim as a result of its interpretation and application of [] § 7151," which statute defines "home improvement." Their briefs focus on the trial court's failure, as they see it, to properly construe the Joaquin Drive project as a "home improvement." They argue that because the Joaquin Drive contract was oral, it violated section 7151.2, which they claim requires a home improvement contract to be written.

Section 7151.2 does not *require* that all home improvement contract be written. That statute merely defines "home improvement contracts."[7] The pertinent statutes requiring that the home improvement contract be in writing are sections 7159 (for repairing, remodeling, and additions) and 7164 (for new construction). To hold defendants liable under the UCL for the Joaquin Drive oral contract, plaintiffs must rely on either of these two sections. We conclude, however, that regardless of whether the Joaquin Drive project was a renovation, as plaintiffs contend -- for which section 7159 requires a written contract -- or was a new construction subject to section 7164's requirement of a written contract, the result here is the same. Stated otherwise, even assuming the trial court erroneously found the project was not a "home improvement" as defined by section 7151, it properly ruled there was no ground for voiding the agreement, and so plaintiffs have no statutory violation on which to base their UCL claim. We shall explain.

The purpose of the UCL " 'is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services.' [Citations.]" (*Kwikset Corp. v. Superior Court* (2011) 51 Cal.4th 310, 320.) Toward that end, "[t]he

---

[7] Section 7151.2 in effect in 2005 read in relevant part: " 'Home improvement contract' means an agreement, *whether oral or written*, or contained in one or more documents, between a contractor and an owner . . . if the work is to be performed in, to, or upon the residence . . . for the performance of a home improvement as defined in Section 7151, and includes all labor, services, and materials to be furnished and performed thereunder." (Italics added.)

11

UCL prohibits, and provides civil remedies for, unfair competition, which it defines as 'any unlawful, unfair or fraudulent business act or practice.' (§ 17200.)" (*Ibid.*) "An 'unlawful' business activity [under the UCL] includes ' "*anything* that can properly be called a business practice and that at the same time *is forbidden by law*." [Citation.]' [Citation.] Virtually any law -- federal, state or local -- can serve as a predicate for an action under Business and Professions Code section 17200. [Citation.]" (*Smith v. State Farm Mutual Automobile Ins. Co*. (2001) 93 Cal.App.4th 700, 717-718, second italics added.) "[A] plaintiff need only show *the violation of any law*. [Citation.]" (*Brockey v. Moore* (2003) 107 Cal.App.4th 86, 98, italics added.)

Here, plaintiffs sought restitution under the UCL for defendants' violation of the Home Improvement Business statutes because the construction contract was oral. Both sections 7159 and 7164 are "part of a larger consumer protection statutory scheme" (*Hinerfeld-Ward, Inc. v. Lipian* (2010) 188 Cal.App.4th 86, 91 (*Lipian*)) that has long required that some home improvement contracts be written. (*Ibid*.)

The version of section 7159 in effect in April 2005[8] when the parties entered into the oral contract for the Joaquin Drive project applied to "home improvement contracts" between a contractor and an owner "for work upon a residential building or structure . . . for proposed *repairing* [*or*] *remodeling*" whose "aggregate contract price" exceeded $500. (Former § 7159, italics added.) A "home improvement contract" was defined as an agreement between the contractor and owner "for the performance of a home improvement." (Former § 7151.2.) A " 'home improvement' " was "the repairing,

---

[8] Section 7159 "has been revised and reorganized repeatedly since first enacted in 1969. [Citations.]" (*Lipian*, *supra*, 188 Cal.App.4th at p. 91.) "A major reorganization of the statutory scheme governing home improvement contracts in 2004, which repealed and reenacted section 7159, was characterized as 'restatements or reorganizations of existing law' with respect to the requirements for a home improvement contract. (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 30 (2003–2004 Reg. Sess.) as amended Apr. 21, 2003, p. 7.)" (*Id*. at fn. 2.)

As the parties discuss the various versions, we recite the versions of sections 7159 and 7164 in effect in 2005, although there has been little if any relevant change since then.

12

remodeling, altering, converting, or modernizing of, or adding to, residential property . . . ." (Former § 7151.) Former section 7159 required that "[e]very contract and any changes in the contract subject to this section shall be evidenced by a writing and shall be signed by all the parties to the contract." (Former § 7159, par. two; see also, *Asdourian*, *supra*, 38 Cal.3d at pp. 289-290.)

While section 7159 applies to repairs or remodels, section 7164 applies to new construction. In 2005, section 7164 provided that "every contract and any changes in a contract, between an owner and a contractor, for the *construction* of a single-family dwelling to be retained by the owner for at least one year shall be evidenced in writing signed by both parties." (Former § 7164, subd. (a), italics added.)

However, it has long been the law that oral home improvement contracts, whether they be agreements for home renovation (§ 7159) or new-home construction (§ 7164), are *voidable, not void*. (*Asdourian*, *supra*, 38 Cal.3d at p. 289; *Lipian*, 188 Cal.App.4th at pp. 92-93; *Arya Group*, *supra*, 77 Cal.App.4th 610.) The Supreme Court in *Asdourian* first addressed this issue. There, the contractor sued to recover compensation from property owners for remodeling work performed under oral contracts. The property owners contended that the contractor was barred from recovering for the completed work because the agreements were oral, and in violation of section 7159. A majority of the Supreme court recognized that former section 7159 with its misdemeanor sanction "unquestionably" applied to the facts of that case. (*Asdourian*, *supra*, 38 Cal.3d at p. 291.) However, although generally, "a contract made in violation of a regulatory statute is void," the Supreme Court emphasized that that " 'rule is not an inflexible one to be applied in its fullest rigor under any and all circumstances. A wide range of exceptions has been recognized.' [Citation.]" (*Ibid.*) The court found "no indication that the Legislature intended that *all* contracts made in violation of section 7159 are void." (*Id.* at p. 292.) Absent an express prohibition, the court determined exceptions to the general rule of unenforceability would apply. (*Ibid.*) For example, "[i]n compelling cases, illegal contracts will be enforced in order to 'avoid unjust enrichment to a defendant and a disproportionately harsh penalty upon the plaintiff.' [Citation.]" (*Ibid.*)

13

The *Asdourian* court held that the circumstances there justified holding the contracts at issue enforceable and not void. (*Asdourian*, *supra*, 38 Cal.3d at pp. 292-293.) The court based this conclusion on the fact the property owners were not members of the group primarily in need of the statute's protection, namely unsophisticated consumers. (*Ibid*.) Rather, the property owners were experienced real estate investors and they and the contractor were "friends, who had business dealings in the past." (*Id*. at p. 293.) Also, a contract that violates section 7159 does not involve the kind of illegality that automatically rendered an agreement void. (*Ibid*.) Finally, the property owners had "accepted the benefits of the oral agreements" and if they were allowed to retain the value of the benefits bestowed by the contractor without compensating him, they would be unjustly enriched. (*Ibid*.)

In *Lipian*, *supra*, 188 Cal.App.4th 86, another Division of this Court of Appeal held that the oral contract for renovation was not void under section 7159 because the facts were "compelling" "warranting enforcement of the oral home improvement contract under . . . *Asdourian*." (*Lipian*, at p. 95.) There, although the property owners were not sophisticated real estate investors or developers, they were exceedingly well educated with experience with contracts and hence " 'were . . . not the typical homeowner.' " (*Id*. at p. 94.) The home improvement project at issue was a complex, high-end remodel and the design had evolved over the years of planning and construction. (*Ibid.*) The homeowners had an "advocate on the project" namely the architect, "who was skilled in construction issues" and was extensively involved as the owners' representative, coordinated with the contractor and subcontractors, and reviewed and approved the contractor's applications for payment. (*Id*. at p. 95.) The *Lipian* court concluded that the homeowners would be unjustly enriched if the contractor were not allowed recovery. (*Ibid*.)

*Arya Group, supra*, 77 Cal.App.4th 610, followed *Asdourian* to reach the same result, this time under section 7164, for an oral contract for the construction of a new home for Cher. There, the contractor discharged a number of services under the agreement before Cher terminated it without paying a $415,169.41 balance due. (*Id*. at

14

pp. 612-613.)  The trial court sustained demurrers to the contractor's complaint without leave to amend.  (*Id*. at p. 612.)  In reversing the judgment, another Division of this District Court of Appeal addressed the narrow question whether as a matter of law section 7164 barred the contractor from pursuing a breach of contract claim because the agreement was oral.  Noting that section 7164 was intended to afford consumers with the safeguards already available under section 7159, *Arya Group* concluded that although it was premature at the demurrer stage to ascertain whether the contractor's situation was a "compelling case" under *Asdourian* (*Arya Group,* at p. 615), the considerations and principles enunciated by the Supreme Court indicated that the contractor might be entitled to some relief because the complaint alleged:  (1) Cher was a highly sophisticated homeowner with previous involvement in residential construction; (2) Cher had legal representatives assisting her in negotiating the contract with Arya Group; (3) the contractor had already completed a substantial amount of the work under the contract; and (4) Cher would be unjustly enriched if she were not required to compensate the contractor for the reasonable value of its work.  (*Id*. at pp. 615-616.)

Following *Asdourian*, *Lipian*, and *Arya*, we conclude it is irrelevant to the result here that the trial court found the project was not a home improvement, because even if it were, the result would be the same under either section 7159 or under section 7164.  Under both statutes, the oral contract here was voidable *and not void*.

Manifestly the same compelling circumstances are present here justifying enforcement of the Joaquin Drive project's oral contract.  Significantly, plaintiffs are exceptionally sophisticated and experienced in real estate matters, Nick's denial notwithstanding.  Nick and Lisa owned numerous properties in addition to the four that were at issue at trial, and Nick managed, developed, and quitclaimed or transferred many of these properties back and forth, rigging deals to avoid taxes.  Plaintiffs formed limited liability companies such as the Tujunga Partnership LLC and GFI.  Lisa is a licensed real estate agent.  Not only have plaintiffs developed many properties with MCR under oral

15

cost-plus agreements and made tidy profits,[9] but they have also had written contracts with defendants. Plaintiffs and defendants had known each other for five years before they embarked on the Joaquin Drive project. They worked together on numerous projects and were friends who saw each other socially. In fact, Nick wanted to become partners with Mark in MCR, claiming he could run the company better than Mark could. Finally, the court found, and plaintiffs do not dispute, that Nick "did not want a written agreement; he wanted to proceed and make changes, additions or alterations as the works moved ahead." If plaintiffs are allowed to recover from defendants the money plaintiffs paid for the Joaquin Drive project, they would be unjustly enriched by benefiting from their own, active decision not to reduce their agreement to writing while retaining the real property *and* recovering the cost of the construction work. In short, the evidence supports the trial court's finding that this is just the sort of compelling case that warrants enforcing the nonconforming contract. (See, e.g., *Arya Group*, *supra*, 77 Cal.App.4th at p. 618, fn. 4 [suggesting addition evaluation of unjust enrichment even if contract is enforced].)[10] As the trial court properly enforced the Joaquin Drive contract, there was no violation of a predicate statute on which to base plaintiff's UCL cause of action and so the trial court did not err in "precluding" plaintiffs' UCL cause of action.

Plaintiffs' attempt to distinguish *Asdourian* and its progeny is unavailing. They observe that each of these cases involved a contractor-plaintiff seeking its fees from the property owner and argue sections 7151.2 and 7159 cannot function as a defense to a property owner's claim that the contractor violated these statutes. Although the factual posture of *Asdourian*, *Lipian*, and *Arya Group* differs from the situation here, these cases all stand for the proposition that under compelling circumstances, an oral home

---

[9]  The court found that the Simeones realized a net gain of $500,000 on the development and sale of 2838 Joaquin Drive and a profit of $300,000 on the development and sale of the Scott Road property. The parties were 50/50 investors in the Harvard Road property each making about an $80,000 profit.

[10]  For this reason, we reject plaintiffs' contention they are entitled to restitution.

improvement contract is enforceable under sections 7159 or 7164, not void. The record supports the conclusion that those compelling circumstances are clearly present here.

2. *The trial court did not err in finding MCR held clear title to the St. Estaban property*.

a. *GFI failed to demonstrate trial court error under the Evidence Code section 662 presumption*.

GFI contends that the trial court erred in finding that GFI did not have 75 percent beneficial interest in the St. Estaban property. GFI contends that the purchase and development of the St. Estaban property was "indisputably" a joint venture between two companies and so joint venture law determines the rights in and obligations arising from that property. However, it is also undisputed, even as its complaint alleges, that GFI transferred full title to the property to MCR.

Evidence Code section 662 provides that "[t]he owner of the legal title to property is presumed to be the owner of the full beneficial title." Under this statute, "the party asserting that title is other than as stated in the deed (here, [GFI]) has the burden of proving that fact by clear and convincing evidence. [Citations.] The presumption can be overcome only by evidence of an agreement or understanding between the parties that the title reflected in the deed is not what the parties intended. [Citations.] Significantly, 'the presumption *cannot be overcome . . . by testimony of an intention *not disclosed to the grantee at the time of the execution of the conveyance*.' [Citations.] *Nor can the presumption be rebutted by evidence that title was taken in a particular manner merely to obtain a loan*. [Citation.]" (*In re Marriage of Brooks & Robinson* (2008) 169 Cal.App.4th 176, 189-190, italics added.)

To overcome the presumption in Evidence Code section 662, the necessary evidence of a contrary agreement or understanding must be " 'clear and convincing.' " (*In re Marriage of Brooks & Robinson*, *supra*, 169 Cal.App.4th at p. 190, quoting from Evid. Code, § 662 [to successfully rebut presumption husband must show clear and convincing evidence of agreement that property was held by community].) "This standard requires evidence that is so clear as to leave no substantial doubt [and]

17

sufficiently strong to command the unhesitating assent of every reasonable mind. [Citation.]" (*Ibid*., internal quotation marks omitted.)

Here, the trial court properly found GFI did not rebut the presumption in Evidence Code section 662 by clear and convincing evidence. The court called the testimony on this question "*a swearing match*" and found plaintiffs' evidence "insufficient to constitute clear and convincing proof." Stated otherwise, the court simply did not believe GFI's testimony. We may not reweigh that determination. " '[W]here the findings are attacked for insufficiency of the evidence, our power begins and ends with a determination as to whether there is *any* substantial evidence to support them; . . . we have no power to judge of the effect or value of the evidence, to weigh the evidence, to consider the credibility of the witnesses, or to resolve conflicts in the evidence or in the reasonable inferences that may be drawn therefrom.' [Citations.]" (*Leff v. Gunter* (1983) 33 Cal.3d 508, 518.) Under the substantial evidence rule, we must accept the evidence most favorable to the finding as true and discard the unfavorable evidence as not having sufficient verity to be accepted by the trier of fact. (*Estate of Teel, supra,* 25 Cal.2d at p. 526.)

The court noted the absence of documentary evidence, such as GFI's or MCR's corporate books and records, of an agreement or understanding between it and MCR that full title in MCR, as reflected in the deed, was not what the parties intended. (See *In re Marriage of Brooks & Robinson*, *supra*, 169 Cal.App.4th at pp. 189-190.) Mark testified that *he did not know of the transfer* at the time GFI conveyed the St. Estaban property to MCR. GFI did not rebut the presumption. (*Id.* at p. 190.) GFI cites the *oral* joint venture as evidence of an agreement with MCR contrary to the form of ownership reflected by record title. However, the trial court found that the joint venture agreement concerned how much the parties would contribute to the venture and how the development profits would be split. But, it was after that contribution that GFI transferred full title to MCR, with the result that the joint venture agreement is not evidence that the intent behind the transfer was other than what was reflected in the deed.

18

GFI next points to the lack of transfer tax on the deeds and argues that this absence is proof MCR did not purchase any interest in the property beyond its 25 percent interest in the joint venture. The trial court discounted GFI's transfer tax evidence. The court found that the statement on the deed that the transfer to MCR did not cause a change in beneficial ownership was a "false statement" made for the purpose of depriving the "taxing authority of the transfer tax of 1.1%." The court reasoned that this false statement *was not in the deed when Nick executed it on behalf of GFI* as conveyor, but was in the deed when it was sent for recording. We will not reweigh this finding.

GFI argues that the sole purpose of the conveyance was so that MCR could obtain a construction loan for development of St. Estaban. Not only is evidence that title was taken in a particular manner merely to obtain a loan insufficient to rebut the Evidence Code, section 662 presumption (*In re Marriage of Brooks & Robinson, supra,* 169 Cal.App.4th at p. 190), but the trial court disbelieved GFI's witnesses that the sole purpose of transferring the property to MCR was to enable MCR to obtain a construction loan. The court was persuaded that GFI's "nefarious motive" for the transfer "was to hide the profits and hence to avoid taxes." Furthermore, the result of the conveyance into MCR is that MCR would become responsible to a lender for 100 percent of a speculative project. The court heard Mark testify that he did not want to expose his company to such risk. The court reasonably did not believe that MCR would accept the burden of such a mammoth obligation while expecting only 25 percent of the profits in a speculative venture.

Finally, GFI argues, Mark's demand that GFI take its 75 percent interest back is the most probative evidence that the parties did not intend to vest MCR with the full 100 percent beneficial title. While GFI may very well have had a different intention in 2002 when it conveyed title to MCR, that intent was never disclosed to the grantee at the time of execution and so the presumption is not rebutted. (*In re Marriage of Brooks & Robinson*, *supra*, 169 Cal.App.4th at pp. 189-190.) More important, GFI has no basis for a declaration that the St. Estaban property should belong to it after the 2007 debt forgiveness agreement.

19

b. *The statute of frauds (Civ. Code, § 1624) does not invalidate the oral 2007 debt forgiveness agreement.*

GFI next contends that the "purported 2007 oral Estaban agreement" was invalid because it was an oral agreement to convey real property, in violation of the statute of frauds, Civil Code section 1624, subdivision (a)(3).[11] The "purported 2007" agreement to which GFI refers appears to be the 2007 debt forgiveness agreement. As GFI characterizes that agreement, "title to [St.] Estaban would *remain in MCR's name . . .* in exchange for the release of any claims he [Mark] and MCR had against GFI or the Simeones." (Italics added.)

The statute of frauds does not apply to the 2007 debt forgiveness agreement. As GFI's contention implicitly concedes, the St. Estaban property was transferred to MCR in 2002, some five years *before* the 2007 debt forgiveness agreement. "[A]n oral contract is enforceable regardless of the statute of frauds if it has been performed fully by one party and all that remains to be done is the payment of money or the transfer of title." (1 Miller & Starr, Cal. Real Estate (3d ed.) Statute of Frauds, § 1:75, fn. omitted, and cases cited therein.) Thus, as the conveyance of the St. Estaban property to MCR occurred in 2002, more than five years earlier, the statute of frauds does not invalidate the debt forgiveness agreement. Moreover, the actual conveyance of the St. Estaban property to MCR was accomplished by way of a deed that was recorded so that transfer would not be invalidated by the statute of frauds irrespective of when it was performed.

3. *The trial court did not err in interpreting the oral agreement and ordering MCR to reimburse plaintiffs $23,059.16 for workers' compensation insurance.*

Defendants cross-appeal contending the trial court erred in ordering them to repay plaintiffs $23,059.16 in workers' compensation insurance charges. Defendants do not

---

[11] Subdivision (a)(3) of Civil Code section 1624 reads: "(a) The following contracts are invalid, unless they, or some note or memorandum thereof, are in writing and subscribed by the party to be charged or by the party's agent: [¶] . . . [¶] (3) An agreement . . . for the sale of real property, or of an interest therein; such an agreement, if made by an agent of the party sought to be charged, is invalid, unless the authority of the agent is in writing, subscribed by the party sought to be charged."

challenge the sufficiency of the evidence to support the court's ruling. Rather, defendants make the purely legal argument that the "trial court erred when it rewrote the oral agreement."**12**

The trial court did not rewrite the Joaquin Drive oral agreement. The basis for the trial court's ruling was that the oral agreement was not "clear." The court then construed the parties' oral agreement and, based on the evidence, ruled that plaintiffs and defendants did not contemplate that MCR could bill plaintiffs for workers' compensation insurance for casual off-payroll workers for whom it never purchased insurance. With oral contracts, as with written agreements, " '[t]he fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties' [citation], and 'questions of "intent" and "purpose" are ordinarily questions of fact' [citation]." (*Byrne v. Laura* (1997) 52 Cal.App.4th 1054, 1066 [interpretation of oral contract].)

The trial court found, based on the testimony, that the workers' compensation insurer charged premiums based on MCR's payroll records, not on the total number of workers. Meanwhile, MCR billed plaintiffs $23,059.15 for workers' compensation insurance for casual laborers and appeared to have considered the extra a "nest egg against which to pay claims arising from these [day] workers." The additional charge for workers not on the payroll, the court determined, was not within the intent of the parties. "When the contract relied on is oral, its interpretation in the first instance is a question of fact to be determined by the jury. [Citation.] The question, therefore, was one of evidence, and it was for the jury to determine from the facts and circumstances proved . . . ." (*Treadwell v. Nickel* (1924) 194 Cal. 243, 261-262.) On appeal, MCR does not demonstrate in what way this finding is not supported by the evidence.**13**

---

**12**     Plaintiffs do not respond to this argument.

**13**     We considered and reject MCR's contention that plaintiffs' claims based on workers' compensation charges are time barred.

21

4. *The trial court did not abuse its discretion in ordering the parties to bear their own costs.*

The trial court here ordered each party to bear its own costs. Plaintiffs contend they were entitled to recover costs because they obtained a net monetary recovery against MCR of $23,059.16. Plaintiffs quote from Code of Civil Procedure section 1032, subdivision (b), which provides, "Except as otherwise expressly provided by statute, a prevailing party is entitled as a matter of right to recover costs in any action or proceeding." (Code Civ. Proc., § 1032, subd. (b).)

Yet, " 'the mandate of cost recovery by the prevailing party under subdivision (b) is limited by the phrase "Except as otherwise expressly provided by statute"; and . . . subdivision (a) expressly states a limitation. . . . [¶] Where the prevailing party is one not specified, Code of Civil Procedure section 1032, subdivision (a)(4) permits the trial court to determine the prevailing party and then allow costs or not . . . *in its discretion.*' " (*Lincoln v. Schurgin* (1995) 39 Cal.App.4th 100, 104-105, italics added, quoting from *Texas Commerce Bank v. Garmendi* (1994) 28 Cal.App.4th 1234, 1248-1249.)

Subdivision (a)(4) of Code of Civil Procedure section 1032, reads in part:
" '*When any party recovers other than monetary relief and in situations other than as specified, the 'prevailing party' shall be as determined by the court, and under those circumstances, the court, in its discretion, may allow costs or not and, if allowed may apportion costs between the parties on the same or adverse sides pursuant to rules adopted under Section 1034.*" (Code Civ. Proc., § 1032, subd. (a)(4), italics added.)

Here, the Simeones did obtain a net monetary recovery on one claim in their third amended complaint. But, MCR prevailed on plaintiffs' cause of action for declaratory relief and on its own cross-complaint with respect to the St. Estaban property. Thus, this is a "situation[] other than as specified" (Code Civ. Proc., § 1032, subd. (a)(4)), and so the prevailing party determination properly fell within the trial court's discretion. (*Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1142 [where plaintiff may win net monetary recovery on remand but defendant prevailed in cross-action for

22

declaratory relief, determination of prevailing party under Code Civ. Proc., § 1032, subd. (a)(4) is within court's discretion]; accord, *Lincoln v. Schurgin*, *supra*, 39 Cal.App.4th at pp. 104-105 [same].) By ordering each party to bear its own costs, the trial court impliedly determined that neither party was the prevailing party. Plaintiffs have not demonstrated how this order was an abuse of the trial court's discretion.

Defendants contend they are entitled to recover costs as a matter of right: MCR against GFI, and Lori and Mark Rolph against Nick and Lisa Simeone. They observe that plaintiffs recovered nothing against Mark and Lori Rolph on their 13 causes of action. They argue that plaintiffs "made heinous accusations against Mark Rolph and Lori Rolph for which they not only sought general, but punitive damages," changed their testimony, "went to great lengths to cover up the truth," and showed "no respect for the court of law and equity." Defendants devote two and a half pages of their appellate briefing to their argument that because MCR and the Rolphs "resoundingly defeated" plaintiffs' "draconian claims," the trial court should have awarded costs to MCR. Yet, defendants cite no case, and we are aware of none, that stands for the proposition that reprehensible behavior during litigation should be considered when determining the prevailing party under Code of Civil Procedure section 1032.

DISPOSITION

The judgment is affirmed.  Each party to bear its own costs of appeal.


**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**



ALDRICH, J.



We concur:




KLEIN, P. J.




CROSKEY, J.