Filed 6/9/21  Redlich v. Reliance Management Group CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| ANNA-BECKY REDLICH,<br><br>    Plaintiff, Cross-defendant and Appellant,<br><br>v.<br><br>RELIANCE MANAGEMENT GROUP, INC. et al.,<br><br>    Defendants, Cross-complainants and Appellants. | A154316<br><br>(San Mateo County<br>Super. Ct. No. CIV 523788) |

Plaintiff and homeowner Anna-Becky Redlich (Redlich) contracted with defendant Vox Design Group, Inc. (Vox) to perform design work and with defendant Reliance Management Group, Inc. (Reliance) to remodel a portion of her home.  Disagreements arose, and Redlich ultimately sued Vox and Reliance, as well as defendant Forrest Linebarger (Linebarger), the CEO of both Vox and Reliance.  She asserted claims for breach of contract, unfair business practices, and fraud.  Reliance, in turn, cross-complained against Redlich and Paul Burton (Burton), who was the Reliance project manager on the remodel, also asserting claims for breach of contract and fraud.

The trial court first granted summary adjudication of certain issues, ruling portions of the Redlich/Reliance contract violated Business and

1

Professions Code section 7159.[1]  At the conclusion of the first phase of the bench trial, the court ruled the contract was void and unenforceable.  At the conclusion of the second phase of the trial, the court found Redlich failed to prove her fraud and unfair business practices claims.  The court also found she suffered damages in the amount of $40,000 and awarded her that amount, but it rejected her request for disgorgement of the over $450,000 she had paid Reliance.  With respect to Reliance's cross-complaint, the court found in Redlich's and Burton's favor.

Redlich and Reliance have both appealed.  Redlich claims the trial court erred in refusing to order disgorgement, ruling against her on her fraud and unfair business practices claims, and excluding evidence of alleged unfair practices by Reliance involving other customers.  Reliance maintains the court erred in concluding its contract with Redlich violated section 7159 and in awarding her $40,000 in damages.  It also asserts the judgment in favor of Redlich and Burton on its fraud and breach of contract claims is not supported by substantial evidence.  We affirm.

## BACKGROUND

We summarize the factual background of the case here to provide context and discuss more detailed facts in connection with our discussion of the issues on appeal.

In 2012, Redlich contracted with Reliance to renovate the "master bedroom, sitting room, closet [and] bathroom" of her home.  The written contract stated the "initial total contract price has been estimated to be $250,000.00."  Redlich was to make a down payment of $1,000.00 and pay the "full and timely consideration on a cost plus basis in accordance with the

---

[1]  All further undesignated statutory references are to the Business and Professions Code.

2

Contract Documents."  The contract also provided Redlich would pay a "retainer" in the amount of "10% of estimated construction costs . . . within 14 days of Commencement of Work."  The contract further stated, "Overhead costs shall be calculated as 16.0% of the total invoiced amount [and] Profit shall be calculated as 7.5% of the total invoiced amount."  Redlich also signed a written design contract with Vox.  Linebarger signed both contracts on behalf of Reliance and Vox.

Between June and November 2012, Vox performed design work for the project.

In November, Redlich executed a "Modification of Home Improvement Construction Management Contract" (boldface omitted), which changed the start date to November 12 and added detailed specifications to section 8 of the contract, "Description of the Project and Description of Significant Materials to be Used and Equipment to be Installed."  (Italics omitted.)  It set out the scope of work in detail with dollar amounts for each line item.  The modification stated the total cost for the specified work was $250,000.00

The parties subsequently executed six written change orders, which added additional costs of about $160,000.00.  Some of the items in the change orders referred to items not part of the original contract, such as exterior stucco.  Redlich declined to sign a seventh proposed change order.

Construction began in November, with Burton as the project manager for Reliance.  Reliance completed its work in July 2013.

The trial court found, during the course of the work, Redlich and Burton "surreptitiously came to an agreement to have Reliance's subcontractors perform [a]dditional [w]ork for Redlich on the side, while the Reliance Project was still being performed."  At the conclusion of the first phase of the trial, the court ruled "there is no requirement that Ms. Redlich

3

was obligated to hire Reliance to perform work in excess of that outlined in the Home Improvement Contract."

The court also ruled at the conclusion of the first phase of trial that the contract was "invalid, void and unenforceable based on many deficiencies and provisions in violation of section 7159," with the remedies to which Redlich might be entitled to be determined at a later time. However, other than a $25,000 " 'retainer' " paid by Redlich, the court did not identify any other provision of the contract that violated section 7159.[2]

At the conclusion of the second phase of the trial, the court granted Reliance, Vox, and Linebarger's motion for judgment on Redlich's claims for fraud and violation of section 7031 (part of the Contractor's State Licensing Law). The court also found the evidence failed "to support [Redlich's claims] for violation of Business & Professions Code section 17200, *et seq.*" Additionally, "in light of the Court's prior . . . findings and order [that the contract] between [Redlich] and [Reliance] violates Business & Professions Code section 7159," the parties stipulated and the court ordered "that [Reliance] and [Linebarger] are enjoined from future use of the form of Home Improvement Construction Management Contract attached to [Redlich's] complaint." As to Reliance's cross-complaint, the court granted Redlich's motion for judgment on Reliance's fraud claim against her but denied Burton's motion for such.

After further trial, the court issued a final judgment in Redlich's favor in the amount of "$40,689.68, plus statutory costs, and post-judgment

---

[2] During trial, Redlich claimed the contract was deficient because of the absence of a specific contract price, the $5 million maximum price, the vague description of the scope of work, the absence of any schedule for progress payments, and the failure to specify that mechanic's liens would be released.

4

interest." The damages included the $25,000 retainer the court found to be in violation of section 7159, plus certain overcharges billed by Reliance and paid by Redlich, some based on improper calculation of overhead and profit. The court declined to order disgorgement of the full amount Redlich paid.

The court also entered judgment in favor of Reliance, Vox, and Linebarger on Redlich's claims for fraud and unfair business practices. Additionally, the court entered judgment in favor of Redlich and Burton on Reliance's cross-claims.

## DISCUSSION

### *Redlich's Appeal*

#### *Disgorgement of Funds Under Section 7159*

Redlich asserts the trial court erred in not ordering Reliance to disgorge all amounts she paid under the home improvement contract. She does not dispute that Reliance satisfactorily performed all work it agreed to do. Instead, she claims that because the trial court concluded the contract was "void, and unenforceable" under section 7159, she is "entitled to recover the $459,000 paid under the illegal contract without any offset for the value of the benefit received from Reliance."

Section 7159 "identifies the projects for which a home improvement contract is required, outlines the contract requirements, and lists the items that shall be included in the contract, or may be provided as an attachment." (§ 7159, subd. (a)(1).) In addition to requiring contracts for over $500 be in writing, it mandates the contract state the contract price, a description of the project and the significant materials to be used, and a statement that the contractor will furnish a mechanic's lien release upon payment being made for work performed. (§ 7159, subds. (b), (c)(4), (d)(5) & (7).) Section 7159 also requires the contract state in bold that "the down payment may not exceed

5

$1,000 or 10 percent of the contact price, whichever is less," (capitalization omitted) and set forth a schedule of progress payments. (§ 7159, subd. (d)(8)(c), (9).)

In *Asdourian v. Araj* (1985) 38 Cal.3d 276 (*Asdourian*)[3], the California Supreme Court considered whether a contractor was barred under section 7159 from recovering compensation for completed home improvement work under a contract that violated that section. (*Asdourian,* at p. 289.) The three contracts at issue were oral agreements to remodel properties owned by the defendants, a husband and wife. (*Id*. at pp. 280. 282.) Because the agreements were not in writing, they violated the requirements of section 7159, and the defendants asserted the three oral contracts were "illegal and unenforceable as violative of public policy." (*Id*. at pp. 289–290.)

The court explained "[g]enerally a contract made in violation of a regulatory statute is void. [Citation.] Normally, courts will not ' "lend their aid to the enforcement of an illegal agreement or one against public policy. . . ." ' " (*Asdourian, supra,* 38 Cal.3d at p. 291.) "This rule is based on the rationale that 'the public importance of discouraging such prohibited transactions outweighs equitable considerations of possible injustice between the parties.' " (*Ibid*.)

However, " 'the rule is not an inflexible one to be applied in its fullest rigor under any and all circumstances. A wide range of exceptions has been recognized.' [Citation.] For example, the rule will not be applied where the penalties imposed by the Legislature exclude by implication the additional penalty of holding the contract void. [Citations.] Further, illegal contracts

---

[3] Superseded by statute on another ground as stated in *Construction Financial v. Perlite Plastering* (1997) 53 Cal.App.4th 170, 175.

will be enforced to avoid unjust enrichment to the defendant at the expense of the plaintiff." (*Asdourian*, *supra*, 38 Cal.3d at p. 291.)

The *Asdourian* court concluded "there is no indication that the Legislature intended that all contracts made in violation of section 7159 are void. Absent an express statutory prohibition, other exceptions to the general rule that illegal contracts are unenforceable may be applied. [¶] In compelling cases, illegal contracts will be enforced in order to 'avoid unjust enrichment to a defendant and a disproportionately harsh penalty upon the plaintiff.' [Citation.] ' "In each case, the extent of enforceability and the kind of remedy granted depend upon a variety of factors, including the policy of the transgressed law, the kind of illegality and the particular facts." ' " (*Asdourian*, *supra*, 38 Cal.3d at p. 292, italics omitted.)

Applying these factors to the oral contracts before it, the *Asdourian* court concluded they were enforceable. First, the court concluded the defendants were not "unsophisticated consumers," the group "primarily in need of the statute's protection." (*Asdourian*, *supra*, 38 Cal.3d at p. 292.) Despite the fact the defendant/husband was a grocer who could not read or write English, the court concluded the defendants were not unsophisticated because they owned "several properties for investment purposes." (*Id*. at pp. 280, 290, 292.)

The court next recognized that "a contract made in violation of section 7159 does not involve the kind of illegality which automatically renders an agreement void. The contracts at issue were not *malum in se*. They were not immoral in character, inherently inequitable or designed to further a crime or obstruct justice. . . . Rather, the contracts were *malum prohibitum*, and hence only *voidable*. . . ." (*Asdourian, supra,* 38 Cal.3d at p. 293.)

7

Lastly, the court concluded the defendants would be unjustly enriched if they were "allowed to retain the value of the benefits bestowed by plaintiff without compensating him." (*Asdourian, supra*, 38 Cal.3d at p. 293.) "The penalty which would result from the denial of relief would be disproportionately harsh in relation to the gravity of the violations." (*Id*. at p. 294.)

Numerous cases since *Asdourian* have applied the same factors in concluding home improvement contracts that violate section 7159 may nevertheless be enforceable. In *Hinerfeld-Ward, Inc. v. Lipian* (2010) 188 Cal.App.4th 86 (*Hinerfeld-Ward*), for example, the homeowners engaged a contractor to complete a remodeling project. (*Id*. at pp. 89–90.) There was no written contract, but "as negotiations continued, the parties entered into a memorandum of understanding and the remodeling and construction work continued." (*Id*. at p. 90.) After two years of work by the contractor, the homeowners terminated the contractor's services when there was an outstanding bill of over $200,000. (*Ibid*.) After the contractor sued, the homeowners claimed the home improvement contract was unenforceable because it was not in writing, in violation of section 7159. (*Ibid*.) They also asserted the trial court erred in requiring them "to prove the *Asdourian* exception does not apply." (*Id*. at p. 93.)

The appellate court first rejected the homeowners' claim that they did not have the burden of proving the *Asdourian* exception. "A defendant who 'advances an affirmative defense to the plaintiff's claims bears the burden of proof on the defense.' " (*Hinerfeld-Ward, supra*, 188 Cal.App.4th at p. 93.)

The court then considered the homeowners' claim the *Asdourian* exception should not apply because they were "inexperienced home improvement consumers . . . [who] lacked training or experience in home

8

construction or home improvement contracts." (*Hinerfeld-Ward*, *supra*, 188 Cal.App.4th at p. 93.) The court pointed out "the sophistication of the parties in construction matters is only one of several factors considered by the *Asdourian* court and its progeny." (*Id.* at p. 94.) Although the homeowners had never been involved in a home improvement project before, they were both well-educated individuals who each had "some experience" with contracts. (*Id.* at p. 93.) The project was not a "typical home improvement project [but] a complex, high-end remodel on which the design continued to evolve over the years of planning and construction." (*Id.* at p. 94.) The homeowners had an " 'owners' representative' " on site, "an advocate on the project who was skilled in construction issues." (*Id.* at p. 95.) Lastly, the court concluded the homeowners would be unjustly enriched if the contractor were not allowed to recover the unpaid fees for work already completed on their project. (*Ibid.*)

Similarly, in *Arya Group, Inc. v. Cher* (2000) 77 Cal.App.4th 610 (*Arya Group*), a contractor and property owner (Cher) made an oral agreement that the contractor would design and build a home on the property for over $4,000,000. (*Id.* at p. 612.) The "oral agreement was subsequently memorialized in a written contract," but Cher did not sign it "despite her promise to do so." (*Ibid.*) After making some payments under the agreement, Cher requested that the contractor meet with another designer and provide plans and designs for the property. "Unbeknownst to [the contractor], the meetings . . . were part of a plan by Cher (who had never intended to sign the contract . . . or honor its terms) to induce [the contractor] to divulge proprietary information relating to the Malibu property so Cher could terminate her contract with [the contractor] without paying [the contractor] for all of the services it had provided. . . ." (*Id.* at p. 613.) After Cher

9

terminated the agreement without paying the contractor over $400,000 that was due, the contractor sued for breach of contract.  Cher demurred, claiming the contract was unenforceable because it was not in writing as required under section 7164.[4]  (*Arya Group,* at p. 613.)

The court concluded "the issue of whether the instant matter is truly a 'compelling case' within the meaning of *Asdourian* cannot be definitively resolved at the demurrer stage."  (*Arya Group*, *supra*, 77 Cal.App.4th at p. 615.)  It held, however, that application of the *Asdourian* principles to the facts as alleged in the complaint "persuades us that this case is one in which [the contractor] *might* be entitled to some relief."  (*Ibid.*)  The court noted "Cher is a highly sophisticated homeowner with previous involvement in residential construction projects, . . . her legal representatives assisted her in negotiating the Malibu construction contact, . . . [the contractor] had already completed a substantial amount of the work it contracted to perform . . . [and] Cher would be unjustly enriched if she were not required to compensate [the contractor] for the reasonable value of its work."  (*Id.* at pp. 615–616.)  Based on those factors, the court "declin[ed] to hold that [the contractor's] noncompliance with section 7164 absolutely foreclose[d] it from seeking to enforce the oral agreement. . . ."  (*Id.* at p. 616.)

In *Davenport & Co. v. Spieker* (1988) 197 Cal.App.3d 566 (*Davenport*), the homeowners signed a written contract for certain home improvement work.  (*Id.* at p. 567.)  Additional work was done pursuant to unwritten change orders, and the homeowners ultimately claimed this failure to comply with section 7159 precluded recovery by the contractor.  (*Id.* at pp. 568–570.)

---

[4]  Section 7164 was "intended to afford consumers who contract for the construction of a single-family dwelling . . . safeguards already available under section 7159 to consumers who contract for 'home improvement' work." (*Arya Group, supra*, 77 Cal.App.4th at p. 614.)

The court considered the *Asdourian* factors, first noting the homeowner was a partner in a real estate investment and development firm, "not a member of the group of unsophisticated consumers which section 7159 is intended to protect." (*Id.* at p. 570.) The court also stated "there is nothing about the nature of the contract in this case which makes it automatically void. . . . [It] is not an inherently illegal or immoral contract." (*Ibid.*) Lastly, the court considered whether the homeowners would be unjustly enriched, explaining there was "no indication" the homeowners "were dissatisfied with the work performed on their residence," and thus "cannot be permitted to retain the benefits of the oral change orders without compensating [the contractor]." (*Id.* at p. 571.)

Redlich maintains that, unlike the property owners in the cases above, she is "a member of the [consumer] group the statute was designed to protect" and this is "not a 'compelling case' " where disgorgement should be denied.

In support of her assertion, Redlich points to the following statement by the trial court at the conclusion of the first phase of the trial: "Well, let me just state, I found her to be very credible. She went to three years of college. She did not graduate. She's been involved in some projects, but I didn't find her to be sophisticated in terms of this. She relied a great deal on Mr. Linebarger's representations." The court further stated: "None of the exceptions that are stated in *Asdourian*, and the cases that follow, really are applicable in this particular case. [¶] In fact, [Redlich] paid $459,000 when her original contemplation of the entirety of the project in the discussions with Mr. Linebarger were $250,000. There's no equitable consideration that goes in favor of the defendant, of Reliance."

11

However, after two more rounds of trial, and by the time the court addressed the issue of the appropriate remedy for the statutory shortcomings in the contract, the court's view had changed. After hearing all the evidence, including Redlich's testimony, the court declined to order disgorgement of the approximately $459,000 Redlich had paid Reliance. The court stated: "I'll state right now, with the testimony the court has heard, it would be inequitable for Mr. Linebarger and Reliance not to receive payment for the work that was done. And the payment has been agreed. Everyone agrees that a change order was signed at the amount that your client said was [$]459,000." It concluded "there's no way the court is going to equitably say that Reliance should disgorge every payment that was made. . . . I think that would violate *Asdourian*." The court subsequently ordered stricken its previous finding, " 'There's no equitable consideration that goes in favor of the defendant, of Reliance.' "

The court therefore limited the award to Redlich to $40,000, based on the $25,000 "retainer" it found to be in violation of section 7159, plus certain overcharges billed by Reliance and paid by Redlich, some based on Reliance's improper calculation of overhead and profit.

Regardless of the level of Redlich's "sophistication," she was educated, owned a sizeable property, and had some hand in the construction process, particularly interacting with Burton. More significantly, the other *Asdourian* factors militated against requiring Reliance to disgorge the payments it received from Redlich. While the trial court ruled the contract violated section 7159 because of the requirement that Redlich pay a $25,000 "retainer," "nothing about the nature of the contract . . . makes it automatically void." (*Davenport, supra*, 197 Cal.App.3d at p. 570.) Indeed, the trial court specifically stated the contract was "not illegal," explaining it

12

"found the contract to be void because of certain deficiencies, not illegal. That's not a finding of the court. The court voided the contract at [plaintiff's] request."

As to the unjust enrichment factor, there was no evidence Redlich was dissatisfied in any way with the work done on her home. She makes no such claim on appeal, maintaining instead she is "entitled to recover the $459,000" paid to Reliance "without any offset for the value of the benefit received," even though "it might seem like a harsh result."[5] Indeed, Redlich has cited no case in which a contractor has been ordered to disgorge payments made by the homeowner for satisfactory work under a contract ultimately found to have violated section 7159.

In sum, the trial court's application of the *Asdourian* factors and conclusion that full disgorgement was not an appropriate remedy is amply supported by the record. (See *Hinerfeld-Ward*, *supra*, 188 Cal.App.4th at p. 93.)

### *Disgorgement of Funds Under Section 7031*

Redlich claims she is also entitled to disgorgement under section 7031 and the trial court erred in not placing the burden on Reliance to prove it had a valid contractor's license. The court found, in its February 2, 2018 "Order on Certain Additional Issues," (some capitalization & boldface omitted) that "The evidence presented fails to prove a violation of Business & Professions Code section 7031." The court similarly stated from the bench, "I don't think

---

[5] In the trial court, Redlich's attorney did not ask for disgorgement of the full $459,000. She stated "Your Honor, just for clarification, we're actually not asking for all of the money to be refunded. I do believe that is a proper reading of *Asdourian*. But my client agrees. She agreed to pay $250,000. Her understanding was that was what she was to pay for this project. She doesn't believe that the project was expanded beyond that scope, and that is all she should have paid."

13

there's anything before me that would allow me to find a violation under [section] 7031 and grant relief under that."

"To protect the public, the Contractors' State License Law (CSLL . . .) imposes strict and harsh penalties for a contractor's failure to maintain proper licensure.  Among other things, the CSLL states a general rule that, regardless of the merits of the claim, a contractor may not maintain any action, legal or equitable, to recover compensation for 'the performance of any act or contract' unless he or she was duly licensed 'at all times during the performance of that act or contract.'  (§ 7031, subd. (a). . . . .)"  (*MW Erectors, Inc. v. Niederhauser Ornamental & Metal Works Co., Inc.* (2005) 36 Cal.4th 412, 418, fn. & italics omitted.)

Section 7031, subdivision (a), thus "provides that no person 'engaged in the business or acting in the capacity of a contractor' can bring an action for compensation for work requiring a contractor's license if the person was not properly licensed at all times during the performance of the work.  Section 7031, subdivision (b) goes further, permitting a person 'who utilizes the services of an unlicensed contractor' to bring an action for disgorgement of 'all compensation paid to the unlicensed contractor.'  Although the language of the two provisions is somewhat different, they are interpreted 'in a consistent manner, resulting in the same remedy regardless of whether the unlicensed contractor is the plaintiff or the defendant.' "  (*Judicial Council of California v. Jacobs Facilities, Inc.* (2015) 239 Cal.App.4th 882, 895, fns. omitted (*Judicial Council*).)

Section 7031 further provides in part:  "no person engaged in the business or acting in the capacity of a contractor, may bring or maintain any action, or recover in law or equity in any action, in any court of this state for the collection of compensation for the performance of any act or contract

where a license is required by this chapter without alleging that they were a duly licensed contractor at all times during the performance of that act or contract regardless of the merits of the cause of action brought by the person, except that this prohibition shall not apply to contractors who are each individually licensed under this chapter but who fail to comply with Section 7029. [¶] (b) Except as provided in subdivision (e), a person who utilizes the services of an unlicensed contractor may bring an action in any court of competent jurisdiction in this state to recover all compensation paid to the unlicensed contractor for performance of any act or contract. [¶]. . . [¶]  (e) The judicial doctrine of substantial compliance shall not apply under this section where the person who engaged in the business or acted in the capacity of a contractor has never been a duly licensed contractor in this state.  However, notwithstanding subdivision (b) of Section 143, the court may determine that there has been substantial compliance with licensure requirements under this section if it is shown at an evidentiary hearing that the person who engaged in the business or acted in the capacity of a contractor (1) had been duly licensed as a contractor in this state prior to the performance of the act or contract, (2) acted reasonably and in good faith to maintain proper licensure, and (3) acted promptly and in good faith to remedy the failure to comply with the licensure requirements upon learning of the failure."  (§ 7031, subds. (a), (b), (e).)

"By statute, a contractor seeking damages must allege and prove it held a valid license before it can prosecute any claim for damages.  Section 7031, subdivision (a) states:  'Except as provided in subdivision (e), no person engaged in the business or acting in the capacity of a contractor, may bring or maintain any action, or recover in law or equity in any action, in any court of this state for the collection of compensation for the performance of any act or

15

contract where a license is required by this chapter *without alleging that he or she was a duly licensed contractor* at all times during the performance of that act or contract, regardless of the merits of the cause of action brought by the person. . . .' (Italics added.) Section 7031, subdivision (d) places the burden of proof on the contractor: 'When licensure or proper licensure is controverted, the burden of proof to establish licensure or proper licensure shall be on the licensee.' (§ 7031, subd. (d).)" (*Jeff Tracy, Inc. v. City of Pico Rivera* (2015) 240 Cal.App.4th 510, 517–518 (*Jeff Tracy*).) If the defendant " ' "controvert[s]" the plaintiff's proper licensure, the plaintiff must prove it by producing verified certificates establishing that he or she held all necessary licenses during performance of the work. (§ [7031], subd. (d).)' " (*Advantec Group, Inc. v. Edwin's Plumbing Co., Inc.* (2007) 153 Cal.App.4th 621, 630, italics omitted.)

We review the trial court's factual finding as to compliance with the statute for substantial evidence.[6] (See *Judicial Council, supra,* 239 Cal.App.4th at p. 902.)

Redlich concedes Reliance introduced into evidence "a copy of its General Building Contractor License certificates covering the period from June 1, 2012 and thereafter." She maintains, however, that Reliance failed to meet a further burden of proving it met two requirements for obtaining a valid contractor's license: worker's compensation coverage and compliance with the "responsible managing employee or officer" requirement.

Redlich first claims Reliance failed to establish it had workers' compensation insurance during the relevant time period, the lack of which

---

    [6] The parties disagree about the standard of review, with Reliance asserting it is both abuse of discretion and substantial evidence, and Redlich claiming the review is de novo because it is a "legal issue[]."

16

would have led to "automatic suspension of a contractor's license by operation of law." "The failure of a licensee to obtain or maintain workers' compensation insurance coverage, if required under this chapter, shall result in the automatic suspension of the license by operation of law in accordance with the provisions of this section." (§ 7125.2.) Redlich asserts "[i]t is undisputed that Reliance itself had no workers compensation coverage."

Linebarger acknowledged Reliance did not have workers' compensation coverage during the relevant time period, but explained that was because "[a]ll of its employees were hired by a staffing agency, and the staffing agency had Workers' Compensation . . . with the staff." Reliance also introduced evidence of a State Compensation Insurance Fund "Verification of Insurance Coverage" form, naming Reliance and indicating workers' compensation coverage on the Redlich project was in effect from March 1, 2012 through March 1, 2014. The verification form listed the address of the Redlich project, and indicated the employer was "Proline Sourcing, Inc." Linebarger testified he did not know if Proline paid for workers' compensation coverage for Burton, but believed Burton was exempt because he was an independent contractor.

Redlich claims this evidence was insufficient, asserting "[n]o evidence was presented as to which employees were covered under any insurance, the payroll reported [by Proline,] or the job categories claimed." However, she cites no authority supporting her assertion Reliance's showing was legally insufficient and it was required to present further evidence regarding specific employees of Proline, who was not a party to this proceeding.

Redlich secondly claims Reliance failed to prove "compliance with the bona fide [responsible managing officer] requirement [of the CSLL] under section 7068.1." (Boldface omitted.)

17

Section 7068.1 provides in part: "(a) The person qualifying on behalf of an individual or firm . . . shall be responsible for exercising that direct supervision and control of his or her employer's or principal's construction operations to secure compliance with this chapter and the rules and regulations of the board. . . . [¶] . . . [¶] (d) The board shall require every applicant or licensee qualifying by the appearance of a qualifying individual to submit detailed information on the qualifying individual's duties and responsibilities for supervision and control of the applicant's construction operations." (§ 7068.1, subd. (a), (d).)

Redlich concedes "Linebarger serves as the RMO for Reliance (Ex. 502, p. 2)," but asserts "once construction began [Linebarger] had no involvement or supervisory role," asserting she and Burton both "testified that they did not recall Linebarger ever being on site once construction began." She claims this testimony demonstrates Reliance "failed to meet its burden to prove proper supervision by its RMO and therefore did not meet its burden to prove licensure."

"In most cases, a contractor can establish valid licensure by simply producing 'a verified certificate of licensure from the Contractors' State License Board which establishes that the individual or entity bringing the action was duly licensed in the proper classification of contractors at all times during the performance of any act or contract covered by the action.' (§ 7031, subd. (d).)" (*Jeff Tracy, supra,* 240 Cal.App.4th at p. 518.) However, "[i]t is possible for a party in a civil action to attack a contractor's license by going behind the face of the license and proving that a required RME is a 'sham.' " (*Buzgheia v. Leasco Sierra Grove* (1997) 60 Cal.App.4th 374, 385, italics omitted.)

18

"In California, a corporation qualifies for a contractor's license 'by the appearance of a responsible managing officer or responsible managing employee who is qualified for the same license classification as the classification being applied for.' (§ 7068, subd. (b)(3); see § 7065, subd. (c)(3) [corporation qualifies for contractor's license 'upon the appearance of a qualifying individual appearing either as a responsible managing officer or a responsible managing employee on behalf of the corporation'].) The qualifying individual must be 'a bona fide officer or employee of the corporation and must be actively engaged in the work covered by the license. [Citation.] The qualifier must exercise direct supervision over the work for which the license is issued to the extent necessary to secure full compliance with the provisions of the law. (§ 7068.1.)' (*Wright v. Issak* (2007) 149 Cal.App.4th 1116, 1123 . . . ; see § 7068.1, subd. (a) [qualifier 'shall be responsible for exercising that direct supervision and control of his or her employer's or principal's construction operations to secure compliance with this chapter and the rules and regulations of the board'].)" (*Jeff Tracy, supra,* 240 Cal.App.4th at pp. 518–519.)

"A variety of activities can constitute direct supervision and control, including ' "one or any combination of the following activities: supervising construction, managing construction activities by making technical and administrative decisions, checking jobs for proper workmanship, or direct supervision on construction job sites." ' (*Acosta v. Glenfed Development Corp.* (2005) 128 Cal.App.4th 1278, 1299 . . . , quoting Cal. Code Regs., tit. 16, § 823, subd. (b).) All of these are factual questions. . . ." (*Jeff Tracy, supra,* 240 Cal.App.4th at p. 519.)

During the second phase of the trial, Linebarger testified about his discussions with Redlich about the scope of the project and his supervision of

it.  In late May or early June of 2012, he did a walk-through of Redlich's home with her and discussed her needs and what the project would entail. He thereafter spoke with Redlich during the design phase of the project, resolving a question she had. He visited the site again at the beginning of construction in late November or early December.  After those visits, he was directly involved in supervising the work, "[n]ot from the site, but from the office."  He oversaw the costs of the work being approved, and had regular conversations with Burton, the project manager, "about the project in the course of my supervision of the job."  He also went over issues and construction details regarding the project with others at Reliance. Linebarger "reviewed all the invoices and reviewed all the cost sheets, and we delivered the work."  This evidence sufficed to show that Linebarger appropriately served as the RMO for Reliance.

In sum, substantial evidence supports the trial court's finding that section 7031 was not violated.

### *Testimony of Other Reliance Customers*

Redlich sought to introduce testimony of almost twenty other Reliance customers and employees, asserting it was relevant to her fraud and unfair business practices claims.  The trial court granted Reliance's motion in limine to exclude the testimony under Evidence Code section 352.

"Evidence Code section 352 confers on the trial court 'broad discretion' [citation] to 'exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.'  (Evid. Code, § 352).  Our review is limited to whether the trial court's determination under [Evidence

20

Code] section 352 constituted an 'abuse of discretion.' " (*People v. Johnsen* (2021) 10 Cal.5th 1116, 1175–1176.)

At the hearing on the in limine motion, Redlich's attorney maintained the evidence by other customers and employees was admissible under Evidence Code section 1105 as "custom and habit" to prove Reliance's specific behavior in this case. Counsel stated, "What we anticipate bringing these witnesses in to say is, when you were presented with this contract, when you spoke with Mr. Linebarger, did you experience the same thing? Were you told one thing despite what the contract said? Were you misled? Were you deceived? Was fraud committed with regard to you? Because a pattern and practice of fraud is very relevant to a fraud case."

The court then asked if the "same statements [were made] in each instance?" Counsel's response was that the statements were "similar" and "the contract has varied a bit over time." She acknowledged "[i]t is not exactly the same change order. It's not exactly the same description of work, but exactly the same problem has happened time and time again."

Thereafter, in granting the motion, the court observed there were "differences in the contract" and "different representations" made with respect to other Reliance customers. In addition, it pointed out the potential for the testimony to take an undue amount of time, stating "Maybe we could turn a two-week trial into a six-week trial?" On balance, the court concluded, "I think the dangers here are really profound. And under Evidence Code Section 352, the court is going to grant this motion in limine."

Redlich relies on *Borse v. Superior Court* (1970) 7 Cal.App.3d 286, in support of her assertion that the court abused its discretion, pointing out the appellate court stated "evidence of other fraudulent representations of like character by the same parties at or near the same time is admissible to prove

21

intent." (*Id*. at p. 289.) But the trial court here did not rule the proffered evidence was inadmissible; rather, it excluded the evidence under Evidence Code section 352. And given the limited probative value of the proposed testimony (due to differences in contracts and representations) and the undue consumption of additional time it would entail, the trial court did not abuse its discretion in granting the motion in limine.

### *The Section 17200 Ruling*

Redlich asserts that, because the trial court found the home improvement contract violated section 7159, it erred in finding no violation of section 17200.

In her second amended complaint, Redlich alleged the improvement agreement violated section 17200 by "charging a retainer in excess of the limits delineated in . . . section 7159.5, utilizing a business entity (VOX) to contract without a license, failing to maintain worker's compensation insurance and providing plaintiff with altered and fraudulent invoices from contractors. The RELIANCE contract violates . . . [s]ection 7159(d)(4) because it does not contain a statement in 12-point boldface type informing plaintiff that she is entitled to a completely filled copy of the contract before any work may be started. LINEBARGER also never provided plaintiff with a copy of the VOX and RELIANCE contracts despite her repeated requests to do so, in violation of . . . section 7159(c)(3)."

At the close of trial, the court ruled as follows: "The evidence presented fails to support [Redlich's] Second Cause of Action for violation of Business & Professions Code section 17200, et seq. [¶] . . . However, in light of the Court's prior December 11, 2017 findings and order that the Home Improvement Construction Management Contract dated June 8, 2012 between [Redlich] and Reliance . . . violates Business & Professions Code Section 7159, the

parties stipulate, and it is therefore ORDERED, that Defendants Reliance . . . and Forrest Linebarger are enjoined from future use of the form of Home Improvement Construction Management Contract attached to [Redlich's] Amended Complaint."

Reliance does not take issue with Redlich's claim of error on the merits. Rather, it maintains Redlich was not prejudiced because she "did not seek damages or restitution on her Section 17200 cause of action," and "obtained the same remedy–injunctive relief–she sought in her Amended Complaint."

Only injunctive relief and restitution may be sought in an action under the UCL. " 'The injunctive and restitutive remedies authorized under the [UCL] . . . are of very limited utility. They are designed to *prevent* unfair business practices and to require *disgorgement* of money or property obtained by means of such practices. Damages are *not* available under Business and Professions Code section 17203. [Citation.] That means that no claim for compensatory or punitive damages can be recovered in a [UCL] action." (*Zhang v. Superior Court* (2013) 57 Cal.4th 364, 376.)

Redlich admits she only sought injunctive relief in her operative complaint and that the court granted it, ordering that "[Reliance] and [Linebarger] are enjoined from future use of the form of Home Improvement Construction Management Contract attached to [Redlich's] complaint." She claims, however, that "she did make a request for restitution at trial" but provides no citation to the record.[7]

---

[7] In a February 2, 2018 brief, Redlich asserted her amended complaint "adequately states a claim for relief consisting of reimbursement of a least a portion of the amounts paid." The damages ordered by the court, although not described as restitution, included repayment of the $25,000 "retainer" the court found violated section 7159.

To the contrary, Redlich's attorney counsel agreed at trial that Redlich was seeking only an injunction. When the trial court indicated it would enjoin use of the home improvement contract by Linebarger and "any other entity that Mr. Linebarger owns and operates," counsel stated, "I believe that satisfies what the plaintiff is seeking with regard to the second cause of action and effectively determines that cause of action."

Thus, regardless of whether the trial court erred in finding no violation of section 17200, any such error was not prejudicial, and Redlich obtained all the relief she requested in connection with that cause of action.[8]

### *Architectural License*

Redlich next claims the trial court erred in finding there was no violation of section 5536.1, which imposes architectural licensing requirements in connection with preparing plans and specifications for certain kinds of construction.

Section 5536.1 provides, "The preparation of plans, specifications, or instruments of service for any building, except the buildings described in Section 5537, by any person who is not licensed to practice architecture in

---

[8] Redlich makes a two-sentence claim that "the court applied the wrong standard in considering Linebarger's fraud." (Capitalization and boldface omitted.) She asserts "the Court remained convinced that Linebarger could not be held personally liable for fraud he personally committed or his own unfair practices because he was acting as the CEO in the course and scope of his employment. [Citation.] This is an incorrect statement of law." It is " 'the responsibility of the appellant . . . to support claims of error with meaningful argument and citation to authority. [Citations.] When legal argument with citation to authority is not furnished on a particular point, we may treat the point as forfeited and pass it without consideration.' " (*Martine v. Heavenly Valley Limited Partnership* (2018) 27 Cal.App.5th 715, 728; Cal. Rules of Court, rule 8.204(a)(1)(B).) We treat Redlich's assertion of error in this regard as forfeited.

this state, is a misdemeanor punishable as provided in Section 5536."
(§ 5536.1, subd. (c).)

However, section 5537 provides an important exception, stating "This chapter does not prohibit any person from preparing plans, drawings, or specifications for any of the following: (1) Single-family dwellings of woodframe construction not more than two stories and basement in height." (§ 5537, subd. (a)(1).) Section 5538 provides an additional exception for "nonstructural or nonseismic . . . interior alterations or additions, fixtures, cabinetwork, furniture, or other appliances or equipment." (§ 5538, subd. (a).)

Linebarger testified he was aware of both exceptions. He thus explained, "we can design wood-framed construction buildings, two stories with a basement. In this case, we were doing much, much less [renovating a master bedroom, sitting room, closet and bathroom]. We can also do renovations on other types of structures. And I believe this fits into both categories, but—because we were just doing renovations on the project, not . . . actually building it." He further explained, the renovation did not involve structural work because "[w]e were just remodeling the space; so we were not actually modifying any of those structural elements. . . . [¶] . . . [¶] I don't believe there were load-bearing walls being modified." Indeed, the permits for the work indicated "[t]here's no structural work. It's an interior renovation without any structural."

Linebarger, who had looked at plans of the house in 2012, additionally testified Redlich's home was a single family dwelling of wood frame construction—the home had "a wood frame as the primary means of bearing and support, and then having steel beams in the floor . . . between the first

and second floor in a few places." "[I]t was primarily composed of wood frame construction."

After hearing the evidence, the trial court stated "the court's understanding is it's both a wood-framed house and also it had steel, structural beams. [¶] . . . [¶] . . .I don't know what the statute means when it's both wood frame and steel beam. I don't know what that means in the abstract." The court concluded "I cannot say that, in fact, the issue that was submitted to the court as to whether an architectural license was required has been proven to the satisfaction of the court. [Redlich] must bear the burden of proof by a preponderance, and it's not there."

Redlich maintains the court erred in "placing the burden of proof on [her]" to prove an architectural license was required to prepare the renovation plans.

However, we need not decide whether the trial court improperly imposed the burden of proof on Redlich, given her lawyer's assertion at trial that "[I]t is a matter of the facts are the facts, and application of them to the law is something that a fact finder can do. I don't believe expert testimony is necessary on this." We view this assertion as a concession there was no further evidence to be had on the issue.

And while the trial court appears to have had some question as to whether Linebarger's uncontroverted testimony was sufficient to establish that the renovation project fell with the statutory exceptions, we have no hesitancy in concluding the evidence was sufficient to do so. (See Miller & Starr, California Real Estate (4th ed. 2020) § 31:111 ["An unlicensed person can design nonstructural or nonseismic portions of storefronts, interior alterations or additions or fixtures, cabinet work, and the like. The statute also exempts remodeling from the necessity for a license as long as there is no

26

effect on the structural integrity of the building.  Therefore, an unlicensed person can prepare the plans, specifications, and drawings for the construction of store fronts, interior alterations or additions, fixtures, cabinet work, furniture, equipment, or any other work involving the remodeling of an existing structure, as long as the structural portions of the building are not affected."  Fns. omitted.].)

Accordingly, even assuming Redlich did not have the burden of proof, once Reliance put on the testimony by Linebarger, the burden of presenting evidence contradicting his testimony was squarely on Redlich, which she declined to do.

In short, even assuming error as to the burden of proof, Reliance put on sufficient evidence of compliance, rendering any error nonprejudicial.

### Reliance's Cross-Appeal

#### The Redlich Contract and Intentional Interference Cross-Claims

Reliance asserts the trial court erred in concluding the home improvement contract was void based on " 'many deficiencies and provisions in violation of section 7159,' " claiming the contract "meets, or substantially complies with, the technical and content requirements of Section 7159."  It contends this error was prejudicial, even though the court denied Redlich's request for disgorgement, because it led to the court dismissing Reliance's own claims for breach of contract (against Redlich) and for intentional interference with contract (against Redlich and Burton).[9]

As we have discussed, one of section 7159's requirements is that a home improvement contract specify that any "downpayment may not exceed

---

[9] The court found "the contract [is] completely invalid and void.  It will not be enforceable.  And, therefore, the breach of contract cause of action, I believe both sides have asserted that, is going to be dismissed because there's

27

$1,000 or 10 percent of the contact price, whichever is less." (§ 7159, subds. (d)(8)(c), (d)(9), capitalization omitted.) Section 7159.5 similarly provides: "If a downpayment will be charged, the downpayment shall not exceed one thousand dollars ($1,000) or 10 percent of the contract amount, whichever amount is less" (§ 7159.5, subd. (a)(3)), and *"[e]xcept for a downpayment, the contractor shall neither request nor accept payment that exceeds the value of the work performed or material delivered."* (§ 7159.5, subd. (a)(5), italics added.) Violation of these statutes by a licensed contractor is a misdemeanor and cause for discipline by the Contractors' State License Board. (§§ 7159.5, subd. (b), 7159, subd. (a)(5).)

The home improvement contract at issue here permissibly stated the down payment was $1,000. It also stated, however, on the same page, that: "A retainer in the amount of 10% of estimated construction costs shall be paid within 14 days of Commencement of Work. This retainer will be held until final billing of services and will be returned to the Buyer after payment of final bill. The parties shall not consider this retainer a down payment or as payment. The retainer shall in no case be paid before commencement of work."

Redlich paid both the $1000 "down payment" and the $25,000 "retainer," which was 10 percent of the "initial total contract price [which] has been estimated to be $250,000."

Reliance, without citation to any authority or further explanation, asserts "invoicing a retainer after commencement of work (and after it had committed approximately $40,000 in job costs)" is not a down payment and "is not a violation of any portion of Section 7159." Instead, Reliance

no basis for it." The court likewise dismissed Reliance's cross-claim for intentional interference with contract.

apparently views the $25,000 "retainer" as having been an acceptable progress payment.  (See § 7159.5, subd. (a)(5) ["[e]xcept for a downpayment, the contractor may neither request nor accept payment that exceeds the value of the work performed or material delivered"].)

The evidence, however, showed the $25,000 invoice was not for work performed or materials delivered.

Reliance sent Redlich two invoices, both dated November 19.  One was for $25,000, indicating it was a "[r]etainer."  The second was for a progress payment of about $36,000 and appears to have been for the "approximately $40,000 in job costs" Reliance had incurred, as that invoice specified it was for "Pre-Construction-Cost Estimate/Project Engineer," "Project Engineering/Site Finishes," "Sub-Preparation/Niz Construction," "Materials-Plumbing Splash Works," and "Travel Exp-Other."  To the extent Reliance asserts invoicing for the $25,000 "[r]etainer" *after* work began necessarily meant it was not a forbidden down payment, it is mistaken.  Neither section 7159 nor 7159.5 permit an excessive down payment, regardless of when invoiced.

In short, substantial evidence supports the trial court's ruling that the contract violated section 7159.  Indeed, Reliance concedes a violation of the statutory down payment provisions was "arguably established by [the] evidence."

Reliance maintains, however, that "even if the charging of [the $25,000 'retainer'] was a violation, it is the only cognizable violation of Section 7159, and, as the Superior Court noted on summary adjudication, it did not 'void[] or render[] unenforceable the entire Redlich Contract.' "

But even assuming the court subsequently erred in declaring the entire contract void, resulting in the dismissal of Reliance's breach of contract and interference with contract claims, Reliance has not demonstrated prejudice.

Reliance's breach of contract claim against Redlich was based on the assertion she and Burton improperly agreed to have work performed " 'on the side,' " done outside of the Reliance contract.  Incorporating its fraud allegations, Reliance alleged that "in or around early 2013 through June 2013, Redlich and Burton began to defraud Reliance by having work on the Project performed 'on the side' without Reliance's involvement.  Indeed, Burton admitted to Reliance's CEO, Forrest Linebarger, in July 2013, that he assisted Redlich in hiring the same subcontractors used by Reliance so that Redlich could hire them 'on the side.' "

However, the trial court, in its statement of decision following the parties' cross-motions for summary adjudication, ruled the portion of section 12.9 of the contract imposing a two-year prohibition on hiring "any person, employee or company that has worked on the Project at the behest of [Reliance]," was "unenforceable in light of [section] 16600."  Thus, the court denied "Reliance's request for a finding that Redlich breached this provision . . . as moot."

At trial, Reliance's counsel defined side work as "[w]ork that was not under Reliance's scope of work, but that [Burton] performed independently of Reliance at the same time."  But after the first phase of trial, the court ruled there was "no requirement that Ms. Redlich was obligated to hire Reliance to perform work in excess of that outlined in the Home Improvement Contract."

Thus, even had Reliance's breach of contract and interference with contract claims not been dismissed on the ground the Redlich contract was void and unenforceable, the court's subsequent rulings, which Reliance has

30

not challenged on appeal, inexorably led to the same result—failure on these claims.  Accordingly, even assuming dismissal of the claims was error, Reliance cannot demonstrate prejudice flowing therefrom.

### *The Fraud Cross-Claims*

After Reliance presented its case at trial, Redlich and Burton moved for judgment on its fraud claims under Code of Civil Procedure section 631.8.  The court granted the motion as to Redlich, but denied it as to Burton.  After the case was fully tried, the court also found for Burton on the fraud cross-claim.  Reliance maintains no substantial evidence supports the judgments in favor of Redlich and Burton.

" 'The elements of fraud, which give rise to the tort action for deceit, are (a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or "scienter"); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage.'  [Citations.]  [¶] 'Promissory fraud' is a subspecies of the action for fraud and deceit.  A promise to do something necessarily implies the intention to perform; hence, where a promise is made without such intention, there is an implied misrepresentation of fact that may be actionable fraud." (*Lazar v. Superior Court* (1996) 12 Cal.4th 631, 638.)

Reliance based its fraud claim on the following allegations:  "Redlich and Burton began to defraud Reliance by having work on the Project performed 'on the side' without Reliance's involvement.  Indeed, Burton admitted to Reliance's CEO, Forrest Linebarger, in July 2013, that he assisted Redlich in hiring the same subcontractors used by Reliance so that Redlich could hire them 'on the side.' [¶] Redlich's contract with Reliance was a 'cost plus' contract, whereby Reliance was to select the subcontractors and was entitled to charge a markup on the amounts billed for labor and

31

materials on the project. In spite of the Home Improvement Management Contract, Burton and Redlich secretly agreed that Burton would arrange for certain labor and materials to be performed directly by subcontractors, without notice to or consent of Reliance, and Redlich would pay the subcontractors directly, plus a twenty-percent (20%) 'project management' fee paid to Burton, with no funds going to Reliance. Redlich and Burton concealed their arrangement from Reliance, and Reliance is informed and believes that Redlich and Burton carried out said scheme between December 2012 and June 2013."

The court ruled, however, in its November 2017 findings and orders of the court on bifurcated issues that "there is no requirement that Ms. Redlich was obligated to hire Reliance to perform work in excess of that outlined in the Home Improvement Contract." And in granting Redlich's motion, the court stated it "has heard absolutely no evidence that would support a finding as to any verdict or judgment of the court as to fraud by Ms. Redlich."

Reliance claims this was error, asserting the following establishes fraud: "Redlich agreed to hire Burton directly to do work that Reliance had proposed to do in Change Order #4, and to pay him directly for managing that work. . . . Redlich admit[ted] that she had written tens of thousands of dollars of checks to Burton. . . . Redlich had notified Reliance and Vox in December 2012—when the 'side work' scheme began—that she only wanted to work with Burton . . . and then, after Burton had been terminated as a project manager, refused to allow Reliance to send anyone else to her property, even to close out the job, . . . doubtless because she did not want Linebarger or anyone else at Reliance to learn that she had schemed with Burton and Reliance's subcontractors to piggyback on Reliance's project costs and do her own side work directly."

32

The evidence showed Redlich signed change order #4 on January 10, 2013, which added "Exterior work per Owner approved specifications . . . [i]nterior door upgrade . . . [and] [f]ireplace including installation." The total added cost on change order #4 was $50,536.21. Reliance concedes it "completed the scope of work for which it was hired," and it does not claim it was not paid for that work.

Furthermore, as we have discussed, the trial court ruled the contractual provision prohibiting Redlich, for two years, from hiring sub-contractors working on the remodeling job to do other jobs was unlawful, and also ruled the contract did not foreclose Redlich from having other work (i.e., "side work") done that was outside the scope of the Reliance contract. These rulings effectively took any wind out of the sails of Reliance's fraud claim against Redlich.

As to the fraud claim against Burton, Reliance claims it was "based on fraudulent misrepresentations." It identifies these as "manipulation[s of] Reliance's records of the project budgets . . . as a result, Linebarger could not know the true facts that the Reliance Project was being manipulated so that Burton and Redlich could perform the side work without Linebarger's knowledge." Reliance claims that, rather than "informing Linebarger or anyone else at Reliance that it was in danger of losing a customer," Burton proposed to Redlich that he perform additional work that was outside the scope of Reliance's contract.

Again, the court's ruling that the contract did not prohibit Redlich from having "side work" done that was outside the scope of the Reliance contract dooms Reliance's fraud claim against Burton.

Indeed, Linebarger testified that Burton, as an independent contractor, was "allowed to work outside of his contract" for other people. And the

Proline contract and addendum, while it specified certain other projects Burton managed, did not identify the Redlich project.

The court concluded: "I certainly don't approve of everything that Mr. Burton did or the way he did it, but he could do independent work under the contract that he had signed . . . with Proline, and the court has already found [it] didn't even apply to the project involving Ms. Redlich. And I don't find any evidence of fraud. [¶] I find that Burton's testimony to be credible. I think it is supported clearly by the other project manager who testified in this matter, and I just don't find any liability for fraud. [¶] . . . [¶] So I find no basis for any damages as to Mr. Burton; and so I find in his favor."

In short, substantial evidence supports the trial court's rulings in favor of Redlich and Burton on Reliance's fraud claims.

### *Calculation of Profit and Overhead*

Reliance also claims the court erred in its construction of the contract's profit and overhead provisions.

The contract provided: "The Buyer shall pay [Reliance] full and timely consideration on a cost plus basis in accordance with the Contract Documents. The Buyer agrees to pay for the Cost of Work, including expenses and labor at the following rates," which were based on position or title of the worker. The section entitled "Schedule of Progress Payments," likewise stated: "This is a cost plus contract."

"Cost of Work" was defined as "all costs associated with the project or done at the behest of the Buyer or Buyer's Consultants. Such costs shall include, but not be limited to: Reimbursable expenses, labor, fees, permits, services, subcontracts, fees, penalties, judgments, pro rata insurance costs, costs of maintaining a site office, telephone expenses, administration expenses, and licenses."

34

As to overhead and profit, the contract provided: "Overhead and Profit shall be charged on the Cost of the Work except on above labor rates" (those being the specified labor rates). In other words, "Cost of Work" was defined as including labor, but the overhead and profit was to be charged on the Cost of Work, excluding labor rates. "Overhead costs shall be calculated as 16.0% of the total invoiced amount. Profit shall be calculated as 7.5% of the total invoiced amount."

Reliance maintains the " 'total invoiced amount' can only be the total amount invoiced to Ms. Redlich." It illustrates by way of the following "instructive example:" If "Redlich were invoiced $1,000 for a certain material, $765 was the cost of the material from the supplier, $160 was overhead and $75 was Profit. Thus, 16% of the total invoiced amount ($160 of $1000) was Overhead; likewise, 7.5% of the total invoiced amount ($75 of $1000) was Profit. The remaining 76.5% ($765) was the Cost of Work."

During the first phase of trial, the court expressed considerable skepticism as to Reliance's deconstructive approach to the invoices, stating: "I agree with the plaintiff's interpretation of this language. It can only mean one thing to a reasonable consumer who entered this agreement, and that is the plaintiff's interpretation. The defense interpretation, including the need for [an expert] to testify, is not only unreasonable, it just doesn't make any logical sense to the court. So the court rejects the defense interpretation. [¶] . . . [I]f there's ambiguity, it was created solely by Mr. Linebarger and by Reliance, and the ambiguity will be resolved against the drafter." The court eventually found "Reliance's calculation was not consistent with the interpretation of this language that the Court adopted. The actual difference in calculation will be determined during the later trial phase of this case."

35

At the close of the first phase, the court "adopt[ed] [Redlich's] interpretation" of the overhead language of the contract. "Pursuant to this interpretation, Reliance should have charged overhead and profit totaling 23.5% (16% + 7.5%) on the total amount *invoiced by subcontractors and material suppliers* for any reimbursable expenses chargeable to Ms. Redlich for this project." (Italics added.)

During the next phase of trial, the court found Redlich had been overcharged for profit and overhead.

"We look to California's rules of contract interpretation to decide whether the questions we address are factual or legal. When interpreting contracts, courts must first determine whether the language is ambiguous, or, in other words, whether it is reasonably susceptible to the interpretation urged by a party. [Citation.] The 'threshold determination of "ambiguity" . . . is a question of law . . . ,' 'subject to independent review.' " (*Oakland-Alameda County Coliseum Authority v. Golden State Warriors, LLC* (2020) 53 Cal.App.5th 807, 816.) "The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity." (Civ. Code, § 1638.)

"When a dispute arises over the meaning of contract language, the court must decide whether the language is 'reasonably susceptible' to the interpretations urged by the parties. [Citation.] ' ". . . Whether the contract is reasonably susceptible to a party's interpretation can be determined from the language of the contract itself [citation] or from extrinsic evidence of the parties' intent [citation]." ' " (*Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 798.)

"If the contract is capable of more than one reasonable interpretation, it is ambiguous [citations], and it is the court's task to determine the ultimate

construction to be placed on the ambiguous language by applying the standard rules of interpretation in order to give effect to the mutual intention of the parties.  [Citation.]  When ambiguities in a standardized contract . . . cannot be dispelled by application of the other rules of contract interpretation, they are resolved against the drafter." (*Badie v. Bank of America, supra,* 67 Cal.App.4th at p. 798.)

"Interpretation of a contract is solely a question of law unless the interpretation turns upon the credibility of extrinsic evidence.  [Citations.] Even where extrinsic evidence is admitted to interpret a contract, unless it is conflicting and requires a determination of credibility, the reviewing court is not bound by the trial court's interpretation."[10]  (*Badie v. Bank of America, supra*, 67 Cal.App.4th at p. 799.)

Here, the plain language of the contract supports the trial court's construction.

The contract specifies that "Overhead and Profit shall be charged *on the Cost of the Work* except on above labor rates."  (Italics added.)  The Cost of Work was defined as "[r]eimbursable expenses, labor, fees, permits, services, subcontracts, fees, penalties, judgments, pro rata insurance costs, costs of maintaining a site office, telephone expenses, administration expenses, and licenses."  Thus, under the plain language of the contract, the overhead and profit are determined by beginning with the total invoiced amount from subcontractors and suppliers, and then calculating the overhead and profit based on those invoiced amounts.  Indeed, Reliance alleged in its cross-complaint that "Redlich's contract with Reliance was a 'cost plus' contract,

_____

[10]  Although Reliance introduced extrinsic evidence at trial in the form of Linebarger's testimony that it was "not a markup calculation" and the testimony of an expert witness regarding the meaning of "profit," it maintains its position is supported by the plain language of the contract.

whereby Reliance was to select the subcontractors and was entitled to charge a markup on the amounts billed for labor and materials on the [Redlich] Project."

In short, the trial court did not error in its construction of the contract. Accordingly, we leave intact the $13,098.20 awarded Redlich for Reliance's incorrect calculation of profit and overhead.[11]

### *Contract Cross-Claim Against Burton*

Reliance asserted a separate breach of contract claim against Burton based on the independent contractor agreement and addendum between Burton and ProLine, which Reliance sought to enforce as a third-party beneficiary.

This agreement stated in part: "This Addendum and the Agreement set forth the entire agreement and understanding between the parties relating to the subject matter herein and supersede[s] any and all prior discussions, agreements, or contracts, whether written or oral. No modification of, or amendment to this Addendum . . . will be effective unless in writing signed by the party to be charged. Any subsequent change or changes in the Independent Contractor's scope of work or compensation will not affect the validity or scope of this Addendum." Exhibit 1A to the Agreement identified four "contracted projects" between Burton and Proline, none of which was the Redlich project.

Burton testified he had never signed any amendments or additional addendum relating to the independent contractor agreement, and specifically had never signed an addendum identifying Redlich or her home improvement

---

[11] The remainder of the $40,689.68 damages award was for the improperly charged $25,000 "retainer" and a double billing of $2,591.48.

project as coming under the agreement. Although Linebarger testified there were other addenda to this agreement, none were produced.

The court found: "In terms of the agreement between Mr. Burton and [Proline], I don't have any evidence that there was any other addendum; and, therefore, I don't even know the applicability of Exhibit 8 to the issues before the court. Because, candidly, I don't think Exhibit 8 really includes Ms. Redlich's property. It doesn't. And the contract indicates that it has to be attached as an addendum. It wasn't. I have no further addendum. "Mr. Linebarger did testify that there were other amendments, but none of them were produced. And, once again, the court finds that testimony to be not believable." The court concluded "Reliance cannot enforce the Proline-Burton independent contractor agreement and addendum, either as a party or a third-party beneficiary."

Reliance claims Burton was judicially estopped from denying the independent contractor agreement applied to the Redlich project because "after multiple admissions during four years of litigation that the Burton Contract was binding, . . . for the first time at trial [he] reversed position and claimed that it was not enforceable against him."

"The elements of judicial estoppel are '(1) the same party has taken two positions; (2) the positions were taken in judicial or quasi-judicial administrative proceedings; (3) the party was successful in asserting the first position (i.e., the tribunal adopted the position or accepted it as true); (4) the two positions are totally inconsistent; and (5) the first position was not taken as a result of ignorance, fraud, or mistake.' [Citations.] Even if the necessary elements of judicial estoppel are satisfied, the trial court still has discretion to not apply the doctrine." (*Owens v. County of Los Angeles* (2013) 220 Cal.App.4th 107, 121 (*Owens*).) " 'The position must be clearly

39

inconsistent so that one necessarily excludes the other. The application has also sometimes been limited by the requirement that to permit one party to change must be unjust to the other party.' " (*Prilliman v. United Air Lines, Inc.* (1997) 53 Cal.App.4th 935, 960 (*Prilliman*).)

Reliance maintains Burton, on three occasions during the litigation, took positions that were inconsistent with his claim at trial that the independent contractor agreement was unenforceable as to the Redlich project.

First, Burton moved to compel arbitration of Reliance's cross-claims against him under the provisions of the independent contractor agreement. Reliance asserts that by so doing he "necessarily asserted the validity of the Burton Contract as to the Redlich Project." The court denied the motion to compel arbitration based on "the possibility of inconsistent factual findings and results . . . if Burton arbitrates the claims against him, while the alleged joint-tortfeasors litigate the same claims in court." (Capitalization omitted.)

Our high court has rejected the view that assertion of the right to arbitrate under a contractual provision is inconsistent with "a party's assertion of the invalidity of an entire contract. . . ." (*St. Agnes Medical Center v. PacifiCare of California* (2003) 31 Cal.4th 1187, 1199.) "In *St. Agnes*, our high court held an insurance company did not automatically waive its right to arbitrate by filing a lawsuit challenging the validity of its contract. . . . [I]n *St. Agnes*, '[n]either party challenge[d] its assent to the [contract].' [Citation.] . . . The rule in *St. Agnes* applies where a party challenges the validity of a contract, not its very existence." (*Brodke v. Alphatec Spine Inc.* (2008) 160 Cal.App.4th 1569, 1576, italics omitted.)

We see little distinction between the defendant's assertion in *St. Agnes* that the supposedly operative contract was wholly invalid and Burton's

40

assertion here that the independent contractor agreement had no application at all to the Redlich project.

Reliance next claims Burton's stipulation to certain facts for the purposes of the parties' cross-motions for summary adjudication and one discovery response were inconsistent with his claim the agreement was inapplicable. The pertinent stipulated facts are as follows: "On July 12, 2011, Burton and Proline Sourcing, Inc. entered into an 'Independent Contractor Agreement for Consultant' which included an 'Independent Contractor Non-[Compete] Agreement Addendum' (collectively, 'the Burton Contract'). . . . [¶] Burton was assigned by Reliance to be Reliance's Project Manager for the Redlich Project. [¶] Burton was acting as Project Manager for the Project when Reliance's work on the Project commenced, and through the entire time Reliance performed work on the Project." The negative discovery response was to a form interrogatory asking whether "any agreement alleged in the pleadings [Reliance's cross-complaint] unenforceable?"

None of these prior "positions" by Burton are "clearly inconsistent" with his position at trial that the independent contractor agreement and addendum was not applicable to the Redlich project. (See *Prilliman, supra,* 53 Cal.App.4th at p. 960.) Whether the independent contractor agreement was "enforceable" is a different issue than whether the agreement applied to the Redlich project. Indeed, Reliance's cause of action against Burton for breach of contract includes the allegation he violated the "Independent Contractor Non-Compete Addendum" by "intentionally interfer[ing] with other contracts that Reliance and/or Vox Design Group had with *other customers*." (Italics added.)

41

And, in any case, Reliance has not identified any favorable court ruling he obtained on the basis of any of these supposedly "inconsistent" positions. (See *Owens, supra,* 220 Cal.App.4th at p. 121.)[12]

## DISPOSITION

The judgment is affirmed.  Each party to bear its own costs on appeal.

---

[12]  Reliance's claim that equitable estoppel should apply is likewise unavailing, because Reliance has not shown Burton " 'represent[ed] or conceal[ed] . . . material facts.' " (*Alameda County Deputy Sheriff's Assn. v. Alameda County Employees' Retirement Assn.* (2020) 9 Cal.5th 1032, 1072.)

 

                                        _____

                                        Banke, J.

We concur:

_____

Margulies, Acting P.J.

_____

Sanchez, J.

A154316, Redlich v. Reliance Management Group, Inc.